**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| NIKISH SOFTWARE CORPORATION and KISHIN BHARWANI, | ) | CASE NO. 1:07-cv-00358-TWP-DML |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MANATRON, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| MANATRON, INCORPORATED, | ) | |
| | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NIKISH SOFTWARE CORPORATION and KISHIN BHARWANI, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**MANATRON'S MEMORANDUM IN OPPOSITION TO
NIKISH SOFTWARE'S MOTION FOR SUMMARY JUDGMENT**

Manatron filed a copyright infringement counterclaim, among others, against Nikish Software Corporation and Kishin Bharwani (collectively referred to as "Nikish") because Nikish's RMS tax software is an unauthorized derivative work of Manatron's MVP tax software. Manatron's counterclaim was filed because Nikish began offering its RMS for sale in 2006 and sold RMS to Clinton County in early 2007. This claim is not based upon software as it existed in February 2010 after several years of rewriting and development.

Nikish's Motion for Summary Judgment relies solely upon the recent report of Dr. Todd Austin ("Austin Report") concerning his comparison of the tax software programs tendered to

him by the parties in accordance with a discovery protocol.  The Austin Report, however, is irrelevant to Manatron's infringement claim because it is not based on RMS as it existed in 2006 or 2007.  Instead, there is compelling evidence that Nikish submitted to Dr. Austin a version of the RMS software that had been substantially rewritten since Nikish delivered it to Clinton County in 2007.

Further, while direct evidence of misappropriation is not often obtained in copyright infringement cases, Manatron has such evidence.  Depositions of (i) Daniel Wimpelberg, a former Nikish employee; (ii) Vicki Norris, a former Nikish contractor; and (iii) Will Norris, an employee of Bartholomew County who attended Nikish's first demonstration to an Indiana county, corroborate evidence from Nikish's own statements and documents that establish that Nikish's RMS tax software is an unauthorized derivative work of Manatron's MVP tax software.

These questions of material fact make the granting of Nikish's Motion for Summary Judgment inappropriate.

## MANATRON'S STATEMENT OF MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ON MANATRON'S COUNTERCLAIMS

**1.     The Austin Report is irrelevant because Dr. Austin reviewed Nikish software as it existed in February 2010 after it had been rewritten.**

Manatron requested, but Nikish refused to provide, any information relating to its RMS source code.  (Nikish's Response to Request for Production No. 1 ("The Source Code for the RMS 2.0 System as it existed on or before December 1, 2006"), 27 ("All documents relating to the RMS 2.0 System, including documents relating to and describing the source therein"), 32 ("All photographs, video tapes, electronic images, drawings, recordings, or other representations of the RMS 2.0"), and 39 ("All documents relating to plaintiffs' efforts to have

the RMS 2.0 system certified by the State of Indiana")).[1]  As a compromise to this discovery dispute, the parties jointly hired Dr. Austin to compare their source code and submitted their respective source code to him in February 2010.  Dr. Austin performed a review of the submitted source code and subsequently issued the Austin Report on June 4, 2010.

While Nikish contends that the Austin Report exonerates it, Nikish's own admissions show the report lacks evidentiary value.   In opposing Manatron's Rule 56(f) motion, Mr. Bharwani stated in his affidavit that Nikish  submitted the current source code as it existed in February 2010 rather than what was first installed in April 2007 or, more importantly, what Manatron had requested in discovery – RMS as it existed on or before December 1, 2006.  In particular, the affidavit states:

> 6.     I verify that the RMS 2.0 source code that I sent to Dr. Austin was **the current production version of RMS in use in Indiana**.
>
> 7.     The development of the Indiana RMS started in November 2005, and **functional and regulatory enhancements continue on to this day** as a result of changes in Indiana law, the requests of customers, and improvements in software technology.
>
> ***
>
> 10.     RMS was first installed April 2007 in Clinton County, Indiana and went live in October 2007 in Clinton County, Indiana.

(Declaration of Kishin J. Bharwani, Docket No. 125, emphasis added).[2]

Mr. Wimpelberg testified that the source code that Nikish submitted to Dr. Austin for review had already been rewritten.  (Wimpelberg Deposition, pp. 17, 65-69).[3]  He testified as follows:

---

[1] Attached as Exhibit C.
[2] Attached as Exhibit 5.
[3] Attached as Exhibit 7.

Q. Were you present when Nikish Software employees discussed a request from Manatron for computer software to be submitted to a computer expert for analysis?

A. Was I in the meeting directly, no, but I heard discussions about it.

Q. What discussions did you hear about Manatron's request that Nikish Software submit --

A. Just that they were requesting a sample of software for review by an expert.  Inter-employee discussions.

Q. What discussions did you hear about that request?

A. Well, just, you know, pretty much that's it.

Q. Did Mr. Bharwani, Mr. Tucci discuss whether they were pleased with the request?

A. Say the question again.

(The record is read back by the reporter.)

A. Yes.

Q. And what did they say?

A. They couldn't have picked a better set of code to review, something very similar to that. I don't know if those are the exact words, but very similar.

Q. Did they explain to you or during those discussions why there couldn't have been a better --

A. Because that code was already rewritten.

Q. Excuse me?

A. Because that code was already rewritten.

(Wimpelberg Deposition, pp. 16-17).

Mr. Wimpelberg also testified that every Nikish employee said that table and field names in the entire RMS database [the software developed by Nikish and alleged to infringe Manatron's MVP tax software] all started with "N" to mask a difference between Nikish's software and

4

Manatron's software because there was a ongoing case [this matter] where it was suspected that the code was used as a basis to create the software that was in place at the time he was working at Nikish.  (Wimpelberg Deposition, pp. 12-14, 43-44, 47-52, 59-60).

**2.     As a contractor, Nikish had access to Manatron's tax software, continues to have Manatron's tax software in its control, and has acknowledged Manatron's tax software being protected.**

Nikish was a contractor for Manatron from 2001 until January 2007 and possessed Manatron's MVP tax software, including source code.  (Affidavit of G. William McKinzie, ¶¶ 4, 7; Affidavit of Marty Ulanski, ¶¶ 4, 6-7).[4]  Nikish used Manatron's MVP tax software while working on projects in Dauphin County, Pennsylvania, and Baltimore, Maryland.  (Affidavit of G. William McKinzie, ¶ 4; Affidavit of Marty Ulanski, ¶ 4).  When asked in this lawsuit to produce all documents that relate to Manatron's software, Nikish responded, "The final copies of the Pennsylvania and Maryland source code are being held by Susan Kornfield, [Nikish's] business attorney."  (Nikish's Response to Request for Production No. 26, pp. 9-10).

Nikish was not allowed to use information or technology that Nikish had developed while working with Manatron between 2001 and 2005.  (Bharwani Deposition, p. 27).[5]  Despite performing services as a contractor for Manatron through January 2007, "Nikish initially began marketing its software in the early part of 2006."  (Affidavit of G. William McKinzie, ¶ 7; Nikish's Answers to Interrogatories, No. 4, pp. 3-5).[6]

---

[4] Attached as Exhibits 1 and 3.
[5] Attached as Exhibit 9.  This deposition is from a lawsuit pending in Clinton County Superior Court filed by Clinton County, Indiana, by and through the Board of Commissioners of the County of Clinton against Nikish Software Corp. and Jacqueline R. Clements with Cause Number 12-D01-0905-PL-215 (transferred to Montgomery Circuit Court on July 10, 2009 with Cause Number 54-C01-0907-PL-240).  This lawsuit relates to Clinton County switching tax software from Manatron to become a BETA site for Nikish in 2007.  Clinton County seeks damages from Nikish for Breach of Contract, Fraud, and Civil Action by Crime Victim.  Clinton County seeks damages from Ms. Clements for Negligence, Actual Fraud, Intentional Interference with Contractual Relations, and Civil Action by Crime Victim.
[6] Attached as Exhibit B.

**3.    Nikish's owner Kishin Bharwani has admitted using Manatron's tax software and believing that he is entitled to use it.**

Mrs. Norris testified that, throughout her contractual relationship with Nikish, Kishin Bharwani stated that he should have the program of Manatron because he was the developer. (V. Norris Deposition, p. 19).[7]  Mrs. Norris testified that "Mr. Bharwani said that he had worked and developed on a program and had a sense of entitlement."  (V. Norris Deposition, p. 62).  She also testified that:

> Yes, [Mr. Bharwani] developed a program that was used in another county, and that was presented in Indiana until he received information from Bartholomew County, as far as the abstract with Indiana data.  So that had to be developed someplace else.

(V. Norris Deposition, p. 63).  Nikish asked Mrs. Norris an additional question on this topic:

> Q  The question I'm asking you is this, did Mr. Bharwani ever tell you that he used some other program to develop the program he was marketing in Indiana?
>
> A  Yes, sir.  That it was his, that he wrote it.  And that he had a sense of entitlement to it.  And it was basis for, and then adapted to this county that he made a presentation of, and then was continued to adapt.

(V. Norris Deposition, p. 64).  In an email to Mr. Bharwani on July 30, 2007, Mrs. Norris states, "Kishin, you follow what your Manatron and ARC sources as they guide you to do; both are failing companies and that's no news to you or anyone."  (V. Norris Deposition, pp. 46-47).  Mr. Bharwani told her that he "had inside sources all over."  (V. Norris Deposition, p. 47).  When Nikish asked her whether this statement was related to the copying of software, Mrs. Norris stated:

***

> I was always being told that he had an in at Manatron and an in at ARC that was doing this and doing that and telling him to watch

---
[7] Attached as Exhibit 10.

> this, watch that, do this, do that.  And, basically, that what I had to
> say meant nothing, if anything had value to him.

***

(V. Norris Deposition, p. 69).  Mr. Bharwani has acknowledged using Manatron tax software by

testifying that Nikish is not using any Manatron tax software "that is protected."  (Bharwani

Deposition, pp. 81-82).

**4.      Nikish's first demonstrations of RMS were to Bartholomew and Clinton counties in 2006, and observers believed that Nikish demonstrated tax software similar to Manatron's tax software.**

The first demonstration by Nikish of its RMS software in Indiana was to Bartholomew

County, Indiana in 2006 while Nikish was still performing services for Dauphin County as a

contractor for Manatron. (V. Norris Deposition, p. 10; Affidavit of G. William McKinzie, ¶ 7).

Nikish had not previously marketed tax software to Indiana clients.  (Affidavit of G. William

McKinzie, ¶ 10; Affidavit of Marty Ulanski, ¶ 8).

Vicki Norris was a salesperson for Appraisal Research Corporation ("ARC") in Indiana.

(V. Norris Deposition, p. 7).  In 2006, Nikish sought to partner with ARC to develop and sell a

combined product to auditors and treasurers in Indiana.   (V. Norris Deposition, pp. 9-10;

W. Norris Deposition, p. 34).[8]   ARC sold a computer assisted mass appraisal ("CAMA")

software program to treasurers for Indiana counties but lacked tax software to sell to auditors.

(V. Norris Deposition, pp. 9-10).  Nikish would provide the tax software, which it titled "RMS."

(V. Norris Deposition, p. 11).   Nikish approached ARC and Mrs. Norris for assistance in

scheduling meetings with auditors and treasurers in the State of Indiana in an attempt to enlist a

county as a Beta site for Nikish's tax software called "RMS."  (V. Norris Deposition, pp. 9-13).

Nikish hired Mrs. Norris as a contractor. (V. Norris Deposition, pp. 5-7).

---

[8] Attached as Exhibit 11.

With the assistance of ARC, Nikish demonstrated the RMS tax software to employees of Bartholomew County, Indiana on July 19, 2006.  (V. Norris Deposition, p. 11; W. Norris Deposition, pp. 35-36; Nikish's Answers to Interrogatories, No. 3, p. 3).  Will Norris, a deputy auditor for Bartholomew County, was in attendance. (W. Norris Deposition, pp. 5, 7, 19; (V. Norris Deposition, p. 32).

During the demonstration to Bartholomew County, there was a discussion of Bartholomew County becoming a Beta site for Nikish Software.  (W. Norris Deposition, pp. 15, 37).  In this instance, Bartholomew County would have been the first user of Nikish's RMS software and would have served as an experimental site to help with the completion of the software.  (*Id.*; V. Norris Deposition, p. 8).  After the Bartholomew County demonstration, Nikish requested and received a copy of the County's property tax database.  (W. Norris Deposition, pp. 11, 18; V. Norris Deposition, p. 14).  However, Bartholomew County never entered into a contract with Nikish to become a Beta site or user of RMS. (V. Norris Deposition, p. 60).

According to Nikish, its RMS tax software was in development stages and was demonstrated as a work in progress.  (Nikish's Response to Requests for Production No. 3 and 4, p. 2).  Nikish did not demonstrate the RMS tax software itself to Bartholomew County but showed various screen shots of what the RMS tax software would accomplish.  (Nikish's Response to Requests for Production No. 3 and 4, p. 2; W. Norris Deposition, p. 19).  Nikish used information from Manatron's project in Dauphin County, Pennsylvania during the demonstration to Bartholomew County.  (W. Norris Deposition, pp. 19-20).  At the time of the Bartholomew County demonstration, Nikish was still performing services for Dauphin County as a contractor for Manatron. (Affidavit of G. William McKinzie, ¶ 7).

8

Mr. Norris's gut feeling was that the software demonstrated by Nikish looked similar to the MVP tax software. (W. Norris Deposition, p. 9). Mrs. Norris is sure Manatron was mentioned during this demonstration because Nikish's sales feature was to present the program as a competitor to Manatron's product. (V. Norris Deposition, pp. 16-17). The Bartholomew County employees said the demonstration was slick. (V. Norris Deposition, p. 16).

Jacqueline Clements, the auditor for Clinton County, met Mrs. Norris of Nikish at the Association of Indiana Counties in September of 2006. (Affidavit of Jacqueline R. Clements, ¶ 4; Clements Deposition, pp. 37-39).[9] Mrs. Norris spoke about new software that Nikish was trying to sell in Indiana. (Clements Deposition, p. 39). Mrs. Clements was not aware of Nikish's software and next spoke with Nikish when Mr. Bharwani sent a letter of introduction requesting to demonstrate the software. (Clements Deposition, pp. 39-40; Affidavit of Jacqueline R. Clements, ¶ 4; October 30, 2006 letter to Jacque Clements).[10] Nikish desired to provide RMS 2.0 to Clinton County as a Beta site for Nikish's new venture into the Indiana tax software market. (Affidavit of Michael A. Beard,[11] ¶ 3; Affidavit of Jacqueline R. Clements, ¶ 5; Conner Deposition,[12] p. 17; Bharwani Deposition, p. 33).

Nikish demonstrated tax software to Clinton County's Assessor's Office, Treasurer, and Auditor on September 27, 2006. (Bharwani Deposition, pp. 24-25, 32-33; Conner Deposition, pp. 9-12; Affidavit of Jacqueline R. Clements, ¶ 4). When Nikish ended the demonstration of tax software, Barbara Conner, the first deputy, told Clinton County's Treasurer Fran Reagan that the tax software looked almost like Manatron's tax software. (Conner Deposition, pp. 7, 16).

---

[9] Attached as Exhibits 2 and 8.
[10] Attached as Exhibit G.
[11] Attached as Exhibit 13.
[12] Attached as Exhibit 6.

Again, Nikish was still performing services for Dauphin County as a contractor for Manatron at this time. (Affidavit of G. William McKinzie, ¶ 7).

**5.      When Nikish first demonstrated its software in 2006, the software was not complete.**

Nikish's software was not complete when it was demonstrated to Bartholomew County or Clinton County.   (V. Norris Deposition, p. 28; Nikish's Response to Requests for Production No. 3 and 4, p. 2).  Clinton County obtained a reduced price from Nikish for RMS 2.0 because Clinton County's auditor agreed to prepare user manuals and documentation for RMS 2.0. (Affidavit of Michael A. Beard, ¶ 3).  This suggests that Nikish launched its RMS software in 2006 as vaporware[13] to attract a Beta site customer.

**6.      Nikish's proposal to Vigo County on August 30, 2006 also establishes that Nikish's tax software (i) relied upon Manatron work and projects, and (ii) was not complete.**

In addition to demonstrating its RMS tax software, Nikish would respond to Request for Proposals from Indiana counties.  On August 30, 2006, Nikish submitted a proposal to Vigo County, Indiana for the Property Tax and Billing System Replacement Project.  (Nikish's Vigo County Proposal, pp. 201-234).[14]  This occurred less than six months after Nikish reduced its obligations to Manatron in March 2006 but before Nikish stopped providing services in Dauphin County, Pennsylvania in January 2007.  (Affidavit of G. William McKinzie, ¶¶ 7, 10; Affidavit of Marty Ulanski, ¶¶ 6, 8; Nikish's Vigo County Proposal, pp. 201-234).

---

[13] Vaporware is a nonexistent product.  *See RWT Corporation v. Wonderware Corporation*, 931 F.Supp. 583, 590 (ND Ill 1996) ("Mr. Asher testified that it is common in the industry to announce a new product that never reaches market and that, without more, he assumed this product might be 'vaporware' (a nonexistent product.");  *Caldera, Inc. v. Microsoft Corp.*, 72 F.Supp.2d 1295, 1299 (D. Utah 1999) ("Among the first of these allegedly improper actions was Microsoft's use of preemptive false and misleading announcements of forthcoming, competitive MS-DOS and Windows products.  This practice of preannouncing upcoming products is known in the industry as 'vaporware.'").

[14] Attached as Exhibit E.

Nikish did not initially market RMS as a new product.  When its RMS tax software was in development stages, Nikish on August 30, 2006 stated, "Our Team has diligently worked on Indiana Version of its Tax Software RMS 2.0 for about one year and expects to have all the Indiana specific functionality in place by before December 2006."  (Nikish's Vigo County Proposal, p. 229).  Nikish also states, "Nikish Software is committed to improving its RMS Product for the Indiana Counties."  (Nikish's Vigo County Proposal, p. 232).  Nikish denies changing the technology after the demonstration to Clinton County but acknowledges it enhanced the product by making improvements to it.  (Bharwani Deposition, pp. 28-29).

In responding to the RFP from Vigo County, Nikish used naming conventions from Manatron's work for the City of Baltimore.  (Affidavit of G. William McKinzie, ¶ 12; Affidavit of Marty Ulanski, ¶ 10; Nikish's Vigo County Proposal, pp. 201-234).  In responding to a RFP from Vigo County, Nikish proposed using a project manager who was a retired Manatron employee whose only experience was working with Manatron's MVP tax software.  (Affidavit of G. William McKinzie, ¶ 12; Affidavit of Marty Ulanski, ¶ 10; Nikish's Vigo County Proposal, p. 210).

In the Vigo County proposal, Nikish states:

a)      The RMS 2.0 solution proposed herein will be supported from our offices in Indiana.  (Nikish's Vigo County Proposal, p. 204);

b)      Nikish Software Corp has built Tax Systems as a subcontractor to a larger company.  We have recently launched our own Tax Product tailored to the Indiana Market.  (Nikish's Vigo County Proposal, p. 207);

c)      Nikish Software Corp was commissioned to perform such a deployment for Dauphin County, PA (Harrisburg), a county with 11,000 parcels. (Nikish's Vigo County Proposal, p. 207);

d)      Nikish Software Corp was engaged to customize and deploy a Tax System for City of Baltimore, MD. This jurisdiction has a parcel count of 250,000 parcels. (Nikish's Vigo County Proposal, p. 208);

e)      Nikish Software is committed to providing Indiana Counties with a State of the art, functionally rich Tax Solution. In this effort we have made a commitment to ***adapting*** our tax product for Indiana (emphasis added). (Nikish's Vigo County Proposal, p. 218); and

f)      All State mandated requirements for Property Tax Billing are built in or will be built without any additional cost to Vigo County. (Nikish's Vigo County Proposal, p. 218).

Nikish proposed completing the "Demonstration of Base Application (includes items of Release 2.1)" on November 10, 2006. (Nikish's Vigo County Proposal, pp. 221, 223). Nikish proposed completing the "Release 2.2 on Test Environment" on December 18, 2006, and the "Release 2.2 on Test Environment" on March 5, 2007. (Nikish's Vigo County Proposal, pp. 222-223).

In regard to conduct test, Nikish states:

> The software developed at Nikish follows methodology and Best practices as recommended by Microsoft from [sic] and other industry leaders. We follow the same testing process as mentioned in RFP paragraph on "Conduct Tests". The base application has gone through the rigorous testing process. The ***modifications to the software*** will also follow the same (emphasis added).

(Nikish's Vigo County Proposal, p. 226).   As of August 30, 2006, Nikish "has commenced dialog with the State regarding Tax Software Certification recently."   (Nikish's Vigo County Proposal, pp. 229).

Nikish does not state in its Vigo proposal that its RMS already had been adapted or that RMS had already been submitted to the State of Indiana for certification.   Nikish states that RMS was in development stages during the demonstration in July 2006 and that Nikish has made a commitment to adapting RMS to Indiana, not that it has adapted RMS to Indiana.

**7.     Nikish's slight change to language in a 2007 proposal after obtaining Manatron's letter does not change Nikish's actions in 2006.**

Manatron's letter to its auditor client base in Indiana is dated December 1, 2006.[15] (Exhibit 12).   On February 23, 2007, Nikish signed an Agreement with Clinton County, Indiana. (Nikish Agreement with Clinton County).[16]   Clinton County was a Beta site for Nikish. (V. Norris Deposition, p. 23).   Four months later on June 18, 2007, Nikish submitted a proposal to Tippecanoe County, Indiana for the Integrated Permitting, Computer Mass Appraisal (CAMA), Tax Billing and Collection System.   (Nikish's Tippecanoe County Proposal, pp. 63-119).[17]

Nikish's statements in this proposal are similar, but not identical, to its Vigo County proposal:

a)      Our product RMS 2.0 was specifically engineered for Indiana Counties.   It was not migrated from another state and retrofitted for Indiana Counties.   (Nikish's Tippecanoe County Proposal, p. 67);

---

[15] Attached as Exhibit 12.
[16] Attached as Exhibit A, and Exhibit A to Clinton County's First Amended Complaint for Damages and Request for Jury Trial against Nikish Software Corp. and Jacqueline R. Clements (Clinton County Superior Court, Cause Number 12-D01-0905-PL-215)
[17] Attached as Exhibit D.

b)      The RMS 2.0 solution proposed herein will be supported from our offices in Indiana.  (Nikish's Tippecanoe County Proposal, p. 74);

c)      Nikish Software Corp has built Tax Systems as a subcontractor to a larger company.  We have recently launched our own Tax Product tailored to the Indiana Market.  (Nikish's Vigo County Proposal, p. 76);

d)      Nikish Software Corp has deployed RMS 2.0 Tax Solution at Clinton County, Indiana.  (Nikish's Tippecanoe County Proposal, p. 76);

e)      Nikish Software Corp was engaged to customize and deploy a Tax System for City of Baltimore, MD.  This jurisdiction has a parcel count of 250,000 parcels.  (Nikish's Tippecanoe County Proposal, p. 76);

f)      Nikish Software is committed to providing Indiana Counties with a state of the art, functionally rich Tax Solution.  In this effort we have made a commitment to *creating* our tax product for Indiana (emphasis added).  (Nikish's Tippecanoe County Proposal, p. 79)

g)      All State mandated requirements for Property Tax Billing are innate or will be constructed without any additional cost to Tippecanoe County.   (Nikish's Tippecanoe County Proposal, p. 79).

After Manatron's letter and Nikish's deployment of RMS to Clinton County, Nikish then states that it has *created* its tax product, rather than *adapted* its product from an existing source.  But updating a proposal in 2007 cannot change what Nikish previously stated to employees, contractors, and Indiana counties in 2006.

**8.      Nikish licensed its RMS tax software by unfairly competing with Manatron.**

Mrs. Norris is sure Manatron was mentioned during the demonstration to Bartholomew County because Nikish presented its software as competing with Manatron.   (V. Norris Deposition, pp. 16-17).   During his demonstration to Bartholomew County, Mr. Bharwani said that he used to work for Manatron.   (V. Norris Deposition, p. 17).   Mr. Bharwani said and reiterated that Manatron's services were lacking, overpriced, and not delivered.   (V. Norris Deposition, pp. 20-21).   But Mrs. Norris heard these statements so much that she could not specifically recall if they were stated during the Bartholomew County demonstration. (V. Norris Deposition, p. 21).   Mr. Bharwani and Mrs. Norris attended Nikish's demonstration to Clinton County, and the comments about Manatron were mostly negative.  (V. Norris Deposition, pp. 27, 61-62).

Nikish used information from Manatron's project in Dauphin County, Pennsylvania during the demonstration to Bartholomew County.   (W. Norris Deposition, pp. 19-20).   Will Norris, the deputy auditor for Bartholomew County, believed that Nikish demonstrated software from Dauphin County possibly to replace Manatron software that Bartholomew County was using.  (W. Norris Deposition, pp. 5, 7-9, 14-15, 19, 23-24, 27).

In responding to the RFP from Vigo County, Nikish used naming conventions from Manatron's work for the City of Baltimore.   (Affidavit of G. William McKinzie, ¶ 12; Affidavit of Marty Ulanski, ¶ 10; Nikish's Vigo County Proposal, pp. 201-234).   In responding to a RFP from Vigo County, Nikish proposed using a project manager who was a retired Manatron employee whose only experience was working with Manatron's MVP tax software.  (Affidavit of G. William McKinzie, ¶ 12; Affidavit of Marty Ulanski, ¶ 10; Nikish's Vigo County Proposal, p. 210).

**9.      The Austin Report does not address any of Manatron's other counterclaims.**

Manatron's counterclaims are based on more than copyright infringement and unfair competition.   The counterclaims are based upon (i) Nikish's conduct in terminating its contractual relationship with Manatron without justifiable cause, (ii) Nikish not completing its work on a project, and (iii) Nikish failing to return documents and other confidential information. (Manatron's Response in Opposition to Nikish's Motion for Partial Judgment on the Pleadings Regarding Defendant's Counterclaims, Docket No. 80).  Nikish's fails to set forth any evidence establishing the lack of a genuine issue of material fact on these other counterclaims.  (Nikish's Brief, Docket No. 117).

Regardless of whether Dr. Austin received the appropriate software from Nikish for review, he was never asked to address these issues.   Accordingly, this Court should deny Nikish's Motion for Summary Judgment on Counterclaims Nos. 1 (Misappropriation of Trade Secrets), 2 (Breach of Contract), 3 (Unfair Competition), 5 (Breach of Fiduciary Duty/Confidentiality), 6 (Breach of Duty of Good Faith and Fair Dealing), 7 (Tortious Interference with Contractual Relationships or Business Expectancy), 8 (Unjust Enrichment), 9 (Deception), and 10 (Conversion). (Exhibit E to Nikish's Memorandum, Dimos email with attachment dated December 24, 2009).

## RESPONSE TO NIKISH SOFTWARE'S
## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      Manatron provides property tax software, appraisal, and other services to state and local governments. See Complaint (Dkt. 1, Exhibit A) at ¶¶ 6.

**Manatron agrees that this statement is not in dispute.**

2.      Nikish develops software in the field of real estate, including tax software for use by local governments. See Complaint at 4, 13.

**Manatron agrees that this statement is not in dispute.**

3.      In 2001, Manatron entered into a contract with Nikish, pursuant to which Nikish was to develop certain tax accounting software (known to the parties as "Tax Billing") for Manatron to deliver to its client, Dauphin County, Pennsylvania. (the "Dauphin County Agreement"). See Complaint at ¶ 7; Counterclaim (Dkt. No. 51) at ¶ 13.

**Manatron agrees that this statement is not in dispute.**

4.      Nikish developed computer software called RMS 2.0, which performed functions regarding the collection of property taxes. See Complaint at ¶ 13; Counterclaim at ¶ 25.

**This statement is disputed.  See Manatron's Statement of Material facts above, Sections 1 through 7.**

5.      On or about December 1, 2006, after Manatron learned that Nikish was marketing RMS 2.0 to Indiana counties, Manatron sent a letter to each of the Auditors of a majority of Indiana's counties. Manatron's December 1, 2006 letter asserted that Manatron had "credible evidence" that Nikish's RMS 2.0 was "nothing more than a misappropriated derivative copy of the Manatron MVP system" that Manatron marketed in Indiana.  See Complaint at ¶ 18; Exhibit A, Manatron Letter Dated December 1, 2006.

**Manatron agrees that it sent a letter to its Auditor client base in Indiana, though it is not material to Manatron's Counterclaims.**

6.      On or about March 15, 2007, Manatron filed an action in Michigan alleging that Nikish breached an agreement pursuant to which Nikish was to develop certain tax accounting software (known to the parties as "Tax Billing") for Manatron to deliver to its client, Dauphin County, Pennsylvania. (the "Dauphin County Agreement").  See Exhibit B, Michigan Complaint.

**Manatron agrees that this statement is not in dispute, though it is not material to Manatron's Counterclaims.**

7.      The parties settled the Michigan action, and as a result of that settlement, the Western District of Michigan entered an order dismissing all of Manatron's claims in that case with prejudice.  See Exhibit C, Order of Dismissal.

**Manatron agrees that this statement is not in dispute, though it is not material to Manatron's Counterclaims.**

8.      The settlement agreement among the parties in the Michigan action (the "Michigan Settlement Agreement") also contained a provision acknowledging co-ownership of software known to the parties as "Tax Claim":

> Manatron and Nikish hereby jointly own all intellectual property and other rights in the Software [Tax Claim], effective as of October 23, 2001. Each party is free to exploit the intellectual property rights in the Software with no obligation to the other, and shall specifically have no duty of accounting to, reporting to, or cooperating with, the other.

Exhibit D, Michigan Settlement Agreement.

**Manatron agrees that this statement is not in dispute, though it is not material to Manatron's Counterclaims.**

9.     On February 15, 2007, Nikish filed this action against Manatron for Tortious Interference with a Business and/or Contractual Relationship (Count 1); Defamation of Nikish Software Company (Count 2); Defamation of Kishin Bharwani, individually and in his capacity as the President and Chief Executive Officer of Nikish Software Company (Count 3); and Breach of Contract (i.e. breach of the Release) (Count 4).  See Complaint.

**Manatron agrees that this statement is not in dispute, though it is not material to Manatron's Counterclaims.**

10.     On April 20, 2007, Manatron filed an answer, which included affirmative defenses but no counterclaims.  See Answer (Dkt. No. 12).

**Manatron agrees that this statement is not in dispute, though it is not material to Manatron's Counterclaims.**

11.     On September 15, 2008, almost one and a half years after Manatron filed its answer, defendant filed a motion for leave to assert a counterclaim for injunctive relief and damages.  See Defendant's Motion for Leave to Assert Counterclaim for Injunctive Relief and Damages (Dkt. No. 40).

**Manatron agrees that this statement is not in dispute, though it is not material to Manatron's Counterclaims.**

12.     This Court granted Manatron leave to file its counterclaim. Manatron's counterclaim contains ten counts: Misappropriation of Trade Secrets (Count I); Breach of Contract (Count II); Unfair Competition (Count III); Common Law Copyright Infringement (Count IV); Breach of Fiduciary Duty/Confidentiality (Count V); Breach of Duty of Good Faith and Fair Dealing (Count VI); Tortious Interference with Contractual Relationships or Business Expectancy (Count VII); Unjust Enrichment (Count VIII); Deception (Count IX); and Conversion (Count X). See Counterclaim.

**Manatron agrees that this statement is not in dispute.**

13. During discovery in this case, the parties conferred with the Magistrate Judge and agreed to develop a plan for producing each parties' source code for review by an expert. See Joint Report Regarding Discovery Plan for Production of Source Code (Dkt. No. 72).

**Manatron agrees that this statement is not in dispute.**

14. After further conferences with the Magistrate Judge, the parties submitted a Joint Discovery Plan for Production of Source Code ("Joint Discovery Plan") (Dkt. No. 79) that provided a framework for an expert review of RMS, MVP, and Tax Claim.

**Manatron agrees that this statement is not in dispute.**

15. In the Joint Discovery Plan, the parties agreed that the expert's findings regarding similarity would be binding:

> 10. The Parties stipulate and agree that any findings by the Expert regarding Similarity are findings of fact presumptively binding upon both parties in the absence of clear error. Both Parties reserve the right to argue the legal significance of such findings including, but not limited to, under 17 U.S.C. § 102(b) and doctrines under copyright law that recognize that not all similarities are actionable, such as scenes a faire, standard software design and development conventions and practices, elements dictated by externalities, and the truth of the statements made by Manatron in its December 1, 2006 letter.

Joint Discovery Plan (Dkt. No. 79) at 6 (emphasis added).

**This statement is disputed. The Expert's findings of fact regarding Similarity are presumptively binding only in the absence of clear error. Nikish submitted RMS source code as it existed in February 2010, not as it existed on December 1, 2006 or was first installed in Clinton County in April 2007. See Manatron's Statement of Material facts above, Section 1.**

16. After the parties submitted the Joint Discovery Plan, they agreed to finalize instructions to the expert for the review. See Order approving February 2, 2010 Joint Status Report Regarding Plan for Source Code Expert Review (Dkt. No. 101).

**Manatron agrees that this statement is not in dispute.**

17.   The parties agreed that Dr. Todd Austin, Professor at The University of Michigan Department of Electrical Engineering and Computer Science, would examine the source code for portions of MVP selected by Manatron, and the source code for RMS' corresponding features and functions.  See Magistrate Judge's Order entered on March 19, 2010 (Dkt. No. 105).

> **This statement is disputed.   Nikish submitted RMS source code as it existed in February 2010, not as it existed on December 1, 2006 or was first installed in Clinton County in April 2007.  See Manatron's Statement of Material facts above, Section 1.**

18.   The parties jointly developed and agreed upon instructions to Dr. Austin regarding the source code review.   See Exhibit E, Dimos email with attachment dated December 24, 2009.

> **Manatron agrees that this statement is not in dispute.**

19.   Dr. Austin acknowledged the parties' instructions and incorporated them in his report, dated June 4, 2010.  See Exhibit F, Expert Report of Prof. Todd Austin, at 15-17.

> **Manatron agrees that this statement is not in dispute.**

20.   Dr. Austin received copies of MVP, RMS, and Tax Claim source code, and conducted a comparison consistent with the parties' agreed instructions.  See *id*. at 1-2.

> **This statement is disputed.   Nikish submitted RMS source code as it existed in February 2010, not as it existed on December 1, 2006 or was first installed in Clinton County in April 2007.  See Manatron's Statement of Material facts above, Section 1.**

21.   Dr. Austin concluded that there were no relevant similarities between RMS and MVP:

> In summary, I was unable to find any relevant similarities between the RMS and MVP code bases. While a few overarching similarities do exist between the two code bases e.g., object oriented programming style, use of decimal arithmetic, and incorporation of a database backend with an SQL interface), these

similarities are indicative of many business-oriented applications. The differences between the applications (e.g., use of different programming languages, employment of different code organizations and different levels of code factoring) provided more insights, suggesting that the two code bases do not have shared authorship. In examining individual source code files in the RMS system, the majority of the files implement simple data routines, user interface, or functionality that could not be located in the MVP code base. The remaining files implement functionality contained in the MVP code base, but in all cases the two implementations are markedly different, to the extent that in most cases what is contained in one file in the RMS code base is spread over many files in the MVP code base.

Id. at 13-14.

**This statement is disputed. Nikish submitted RMS source code as it existed in February 2010, not as it existed on December 1, 2006 or was first installed in Clinton County in April 2007. See Manatron's Statement of Material facts above, Section 1.**

## LAW AND ANALYSIS

When considering a motion for summary judgment, the court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir.2000). In its consideration, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence; the court must view all the evidence in the record in the light reasonably most favorable to Manatron, as the non-moving party, and resolve all factual disputes in favor of Manatron, the non-moving party. *See* Fed.R.Civ.P. 56(c); *Anderson*, 477 U.S. at 249-50.

**I.   Because Nikish submitted source code as of February 2010 that had been rewritten for four years, the Austin Report is clearly in error.**

Manatron requested in discovery the RMS source code as it existed in December 2006, and Nikish objected to producing any RMS source code to Manatron for analysis.  The parties agreed to hire Dr. Austin and established a protocol as a compromise to this impasse.  Yet, as Nikish admits, it submitted to Dr. Austin RMS source code as it existed in February 2010, not as it existed on December 1, 2006 or was first installed in Clinton County in April 2007.  (Bharwani Declaration, pp. 2-3).  Manatron never requested, did not agree, and was not even told that Nikish would submit February 2010 RMS source code to Dr. Austin.[18]

The relevant inquiry is whether RMS source code in December 2006, which Nikish admits adapting from Manatron's source code, was similar to MVP at that time.  Whether or not Nikish has effectively rewritten code over a four year period to mask the similarities that previously existed means nothing in this dispute.  And Nikish knows it.

Manatron finds it noteworthy that Nikish chose to tender a more recent version of the RMS software to Dr. Austin and has resisted production of the earlier versions.  The inference is clear, the earlier versions would substantiate Manatron's infringement claim.  The testimony of Mr. Wimpelberg reinforces this inference.  He testified that Nikish was pleased because there could not have been a better set of code to review because it has been rewritten.  (Wimpelberg Deposition, pp. 16-17).  Mr. Wimpelberg also testified that every Nikish employee said that table and field names in the entire RMS database all started with "N" to mask a difference between Nikish's software and Manatron's software because there was a ongoing case where it was suspect that the code was used as a basis to create the software that was in place at the time he

---

[18] If Nikish contends that the February 2010 RMS source code was the only source code available for submission to Dr. Austin, this important information was not communicated to Manatron.

was working at Nikish.   (Wimpelberg Deposition, pp. 12-14, 43-44, 47-52, 59-60).   Nikish submitted proposals for and made demonstrations of its RMS tax software in 2006.   Nikish delivered RMS to Clinton County in 2007 and submitted RMS to the State of Indiana for certification.   If Nikish no longer has RMS as it existed in 2006 and 2007, then Manatron is entitled to an adverse inference that such versions infringed upon Manatron's MVP tax software.

Nikish may claim the discovery protocol was not clear as to what version was to be produced to Dr. Austin.   For that matter, Nikish may somehow blame Manatron for the fact that Dr. Austin received current source code to review. However, such suggestions only highlight the erroneous underpinnings of the Austin Report and obfuscate the fact that Nikish had sole control over what source code was submitted to Dr. Austin for review and unilaterally chose to engage in an empty and irrelevant exercise to review February 2010 RMS source code.   Only Nikish was in the position to identify any such confusion or misunderstandings and raise the issue with Manatron.   Was the submission of the current RMS source code an attempt to take advantage of "presumptively binding" language in the Joint Discovery Plan (Docket No. 79) through a bait and switch?   Manatron hopes not, but that is what has occurred with Nikish's Motion for Summary Judgment.

As long as Nikish refuses to produce either the December 2006 or April 2007 version of RMS source code to Manatron for review and analysis, genuine issues of material fact exist as to whether Nikish wrongfully copied Manatron's MVP tax software.   Dr. Austin's analysis and report is on its face irrelevant to whether Nikish's RMS is an unauthorized derivative copy of Manatron's MVP and clearly in error because Nikish failed to submit source code that had not yet been rewritten.   Because Nikish's Motion for Summary Judgment is based solely upon the

Austin Report, this genuine issue of material fact entitles Manatron to an Order denying Nikish's Motion.

## II.     Nikish's own statements and documents establish that it possessed Manatron's source code and used Manatron's source code to sell and adapt tax software for Indiana.

For a federal copyright infringement claim, a plaintiff must establish: "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Schrock v. Learning Curve Intern., Inc.*, 586 F.3d 513, 517 (7th Cir.2009) (quoting in part *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)).   Manatron must necessarily prove that Nikish copied Manatron's original work to prevail on a copyright infringement claim.  *See JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir.2007).  A work, or an element of a work, only qualifies as "original" for copyright purposes when it represents "some minimal degree of creativity," or was the product of "intellectual production, of thought, and conception."  *Feist*, 499 U.S. at 362 (quotation omitted). Nikish does not dispute that Manatron owns its MVP software.  So Manatron need only establish the second element: copying.

Manatron can prove copying in one of two ways, either "by direct evidence" of copying or else by inference that copying must have occurred because "the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work."  *JCW*, 482 F.3d at 915 (quotation omitted).  By both ways, the evidence shows that Nikish launched its RMS software in 2006 as vaporware to attract a Beta site customer and then infringed Manatron software by creating an unauthorized derivative work of the MVP tax software as its RMS tax software.  While Nikish was making demonstrations and submitting proposals in 2006, it was

still performing services to Dauphin County as a contractor for Manatron.   (Affidavit of
G. William McKinzie, ¶ 7).

Statements of Mr. Bharwani and other Nikish employees are the direct evidence.  (See
Statement of Material Facts, Sections 1, 3-7 above).   Mrs. Norris worked with Nikish and
Mr. Bharwani in 2006 and 2007 and testified:

> Q  The question I'm asking you is this, did Mr. Bharwani ever tell
> you that he used some other program to develop the program he
> was marketing in Indiana?
>
> A  Yes, sir.  That it was his, that he wrote it.  And that he had a
> sense of entitlement to it.  And it was basis for, and then adapted to
> this county that he made a presentation of, and then was continued
> to adapt.

(V. Norris Deposition, p. 64).  In an email to Mr. Bharwani on July 30, 2007, Mrs. Norris states,
"Kishin, you follow what your Manatron and ARC sources as they guide you to do; both are
failing companies and that's no news to you or anyone."  (V. Norris Deposition, pp. 46-47).
Mr. Bharwani told her that he "had inside sources all over."  (V. Norris Deposition, p. 47).
When Nikish asked her whether this statement was related to the copying of software,
Mrs. Norris stated:

***

> I was always being told that he had an in at Manatron and an in at
> ARC that was doing this and doing that and telling him to watch
> this, watch that, do this, do that.  And, basically, that what I had to
> say meant nothing, if anything had value to him.

***

(V. Norris Deposition, p. 69).  Mr. Bharwani himself acknowledged using Manatron source code
by testifying that Nikish has not used any Manatron software code that is protected.  (Bharwani
Deposition, pp. 81-82).  But Nikish does not determine what elements are protected and cannot

rewrite code to mask similarities, as Mr. Wimpelberg testified was done.   (Wimpelberg Deposition, pp. 12-14, 43-44, 47-52, 59-60).

Manatron has proven the inference of copying because (i) Nikish admits having and still possesses Manatron's source code, (ii) two third-party observers of Nikish's demonstrations testified that Nikish's software was similar to Manatron's software, and (iii) Nikish has refused and apparently continues to refuse to produce RMS source code as of December 2006.   When asked to produce all documents that relate to Manatron's software, Nikish responded, "The final copies of the Pennsylvania and Maryland source code are being held by Susan Kornfield, [Nikish's] business attorney."   (Nikish's Response to Request for Production No. 26, pp. 9-10). Nikish cannot dispute having access to Manatron's MVP tax software.

Substantial similarity is viewed under "the 'ordinary observer' test: whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (quotation omitted).   Mr. Norris's gut feeling was that the software demonstrated by Nikish looked similar to the MVP tax software.   (W. Norris Deposition, p. 9).   When Nikish ended the demonstration of tax software to Clinton County, Barbara Conner told Clinton County's Treasurer, Fran Reagan, that the tax software looked almost like Manatron's tax software.  (Conner Deposition, p. 16).

Because of the direct evidence from Nikish and because of the inference of copying from Nikish's possession of Manatron source code and the testimony of ordinary observers, Manatron is entitled to an entry denying Nikish's Motion for Summary Judgment.

**III.    In regard to Manatron's other nine counterclaims, Nikish failed its initial burden of demonstrating the absence of a genuine issue of material fact that entitles Nikish to judgment as a matter of law.**

Nikish believes that Manatron's other nine counterclaims "somehow relate[] to Nikish's alleged reproduction, preparation of derivative works and/or distribution of the MVP source code." (Nikish's Memorandum at 15). In less than two pages at the end of its brief, Nikish simply cites to allegations from each of the remaining nine counterclaims and then summarily argues:

> Dr. Austin's findings conclusively refute each of the bases above for Manatron's claims of trade secret misappropriation, breach of contract, unfair competition, breach of fiduciary duty, breach of the duty of good faith and fair dealing, tortious interference, unjust enrichment, deception, and conversion.

(Nikish's Memorandum at 15). But Manatron has already explained how its other nine counterclaims are independent of its copyright infringement claim.

On June 29, 2009, Manatron filed its Response in Opposition to Nikish's Motion for Partial Judgment on the Pleadings Regarding Defendant's Counterclaims (Docket No. 80) and stated:

> On their face, Manatron's counterclaims are based on more than Nikish's misappropriation of the MVP source code. The claims also derive from Bharwani's conduct in walking off the job without justifiable cause, Nikish not completing its work on the project, Nikish failing to return documents and other confidential information, and Nikish soliciting business, employees and otherwise unfairly competing with Manatron, all in violation of the Agreement. Dismissal on the pleadings is not proper.

(Manatron's Response at 3). Nikish fails to identify any portions of pleadings, depositions, answers to interrogatories, admissions on file, or affidavits that address these allegations. Dr. Austin was not asked to analyze Nikish's contracts, projects, demonstrations, or other sales features, and, in fact, his review of a later version of RMS source code proves nothing. Because

Nikish failed its initial burden, Manatron is entitled to the denial of Nikish's Motion for Summary Judgment as to its other nine counterclaims.

Assuming arguendo that Nikish has somehow satisfied its initial burden, genuine issues of material fact exist with each of the other nine counterclaims.

**(a)      Count I (Misappropriation of Trade Secrets)**

Trade secret law has developed to promote "[t]he maintenance of standards of commercial ethics and the encouragement of invention . . . ." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). The purpose underlying trade secret law is the protection of effort and imagination resulting in a commercial advantage. *Amoco Production Co. v. Laird*, 622 N.E.2d 912, 921 (Ind. 1993). To establish a violation of the Indiana Uniform Trade Secrets Act, Manatron must prove two elements: (1) existence of a trade secret and (2) misappropriation of that trade secret. Ind. Code § 24-2-3-2; *Weston v. Buckley*, 677 N.E.2d 1089, 1091 (Ind. Ct. App. 1997). Information or technology may constitute a trade secret even if it lacks the modicum of creativity required by the Copyright statute. Nikish lists examples of content that is not entitled to Copyright protection but fails to establish that such information or technology is not protected as a trade secret. (Nikish's Brief, pp. 6-8). Nikish acknowledges that it was not allowed to use information or technology that Nikish had developed while working with Manatron between 2001 and 2005. (Bharwani Deposition, p. 27). There is no dispute that Manatron's source code, information, and technology is a trade secret. Otherwise, the parties would not have had to hire Dr. Austin to review their source code.

Misappropriation can be established by both direct and circumstantial evidence, but direct evidence is rarely available. *E.g.*, *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1429 (7th Cir. 1994); *Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806, 814

(E.D. Pa. 1974) (more often than not "plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place").  A showing of access and similarity may support a trade secret misappropriation claim and are sufficient to survive summary judgment.  *Sokol Crystal Prods.,* 15 F.3d at 1429 (the jury inferred from the defendant's access to plaintiff's confidential information and from the similarity between the two devices that defendant misappropriated plaintiff's trade secrets).

Misappropriation occurs when the trade secret is used as a guide or starting process and also occurs when a defendant uses a plaintiff's trade secret to learn "what pitfalls to avoid." *Merck & Co.,* 1999 WL 669354, at *20; *Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1299 (E.D.N.C. 1996), *aff'd*, 110 F.3d 1562 (Fed. Cir. 1997).  It is not necessary that Nikish exactly duplicated each and every element of Manatron's trade secret.   *Mangren Research and Development Corp. v. Nat'l Chemical Co., Inc.*, 87 F.3d 937, 944 (7th Cir. 1996).  As the Seventh Circuit noted, the defendant is liable for use of another's trade secret "even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret."  *In re Innovative Constr. Sys.*, 793 F.2d 875, 887 (7th Cir. 1986).  The evidence used above to establish access and similarity also establishes trade secret misappropriation.

### (b)   Count II (Breach of Contract)

"To recover for a breach of contract, a plaintiff must prove that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind.Ct.App. 2007).   "The interpretation and construction of a contract is a function for the courts." *Stenger v. LLC Corp.*,

819 N.E.2d 480, 484 (Ind.Ct.App.2004); see also *Grand Trunk W. R.R. Co. v. Kapitan*, 698

N.E.2d 363, 367 (Ind.Ct.App.1998) ("Contract interpretation is a question of law to be

determined by the court.").   A party breaches a contract either by placing itself in a position

where it can't perform its contractual obligations, or by failing to perform all of its contractual

obligations.  *Strodtman v. Integrity Builders, Inc.*, 668 N.E.2d 279, 282 (Ind.Ct.App.1996).

Nikish breached the Agreement by:

(a) Walking off the Dauphin county job site leaving some of the source code undeveloped.  Key portions of the code remain undeveloped, while other portions that were developed, have severe defects for which Manatron has incurred damages in attempting to repair;

(b) Failing to return confidential and proprietary Materials and other Deliverables, including the MVP application source code, as required by the Agreement.  Nikish did not have a right to terminate unless Manatron was in default or ceased doing business in the normal course.   Neither of those conditions was present.

(c) Nikish using confidential and proprietary Materials and Deliverables to develop a software program, the RMS 2.0 (an illegal derivative of Manatron's MVP source code), which Nikish marketed to state and local governments in direct competition with Manatron, and in violation of the 2001 Pa. Software Development Agreement;

(d) Using Manatron's confidential information to the detriment of Manatron and/or to the benefit of Nikish;

(e) Usurping business/sales opportunities from Manatron; and

(f) Utilizing Manatron's confidential information for personal/ corporate gain.

(Manatron's Counterclaim Injunctive Relief and Damages, Docket No. 51 at ¶57, pp. 11-12).  As

set forth above, Manatron has established that Nikish used and still possesses Manatron software,

used projects to sell Nikish's software, and passed off Manatron's product as its own.  (See

Statement of Material Facts, Sections 1-9 above).

(c)        **Count III (Unfair Competition)**

"The tort of unfair competition is premised upon the rationale that a person who has built up good will and reputation for his business is entitled to receive the benefits from his labors. [Indiana] courts have held that such an interest is a property right deserving judicial protection." *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport, Inc.*, 501 N.E.2d 458, 460-61 (Ind.Ct.App.1986) (citing *Hartzler v. Goshen Churn and Ladder Co.*, 55 Ind.Ct.App. 455, 104 N.E. 34, 37 (1914)). Thus, under Indiana law, the tort of "unfair competition" encompasses acts that "although . . . generally considered a fair and welcomed part of vibrant competition, [are engaged in] for the primary purpose of destroying a competing business." *Bartholomew County Beverage Co., Inc. v. Barco Beverage Corp., Inc.*, 524 N.E.2d 353, 358 (Ind.Ct.App.1988) (holding that the tort includes the "palming" of one's goods or services as those of someone else, as well as actions for the interference with a contract or business relationship and predatory price cutting).

In *Felsher v. University of Evansville*, 755 N.E.2d 589 (Ind.2001), the Indiana Supreme Court described a cause of action for unfair competition as "historically considered a subspecies of the class of torts known as tortious interference." *Id*. at 598. The claim is available when a party engages in conduct, the natural and probable effect of which is to deceive the public into believing that its goods or practices are those of another, the most common example of which involves trademark use. *Id*.; *see also Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir.1968).

The unfair competition is Nikish's conduct in competing with Manatron in violation of the Agreement and addresses confidential information exclusive of the MVP source code. As set forth above, Manatron has established through direct evidence that Nikish used Manatron

software and projects to sell Nikish's software, that Nikish disparaged Manatron and its services, and that Nikish passed off Manatron's product as its own.   (See Statement of Material Facts, Sections 1-9 above).

**(d)      Count V (Breach of Fiduciary Duty/Confidentiality) and VI (Breach of Duty of Good Faith and Fair Dealing)**

The elements of a claim for breach of fiduciary duty are (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendants' breach. *See F.T.C. v. Think Achievement Corp*, Cause No. 2:98-CV-12-TS, 2007 WL 3286802, at *4 (N.D.Ind., Nov.5, 2007) (citing *W & W Equip. Co. v. Mink*, 568 N.E.2d 564, 570-76 (Ind.Ct.App.1991)).   Nikish was a contractor to Manatron and has acknowledged that it was not allowed to use information or technology that Nikish had developed while working with Manatron between 2001 and 2005.   (Bharwani Deposition, p. 27).   By improperly using Manatron's software and information that were entrusted to Nikish as a contractor, Nikish has acted in bad faith and breached its duties to Manatron.

**(e)      Count VII (Tortious Interference with Contractual Relationships or Business Expectancy)**

Five elements are necessary to support a claim for tortious interference with contract: (1) existence of a valid and enforceable contract, (2) defendant's knowledge of that contract, (3) defendant's intentional inducement to breach that contract, (4) the absence of justification, and (5) damages resulting from the breach.  *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 922 (Ind.Ct.App.2002).   Clinton County, Indiana was Nikish's first customer and a Beta site. But Clinton County was a Manatron customer.  Mr. Bharwani and Mrs. Norris attended Nikish's demonstration to Clinton County, and the comments about Manatron were all encompassing, with the majority being negative.  (V. Norris Deposition, pp. 27, 61-62).   Clinton County has sued Nikish and its former auditor who recommended that Nikish be hired.  (*Clinton County,*

*Indiana, by and through the Board of Commissioners of the County of Clinton v. Nikish Software Corp. and Jacqueline R. Clements*, Clinton County Superior Court (Cause Number 12-D01-0905-PL-215; transferred to Montgomery Circuit Court on July 10, 2009 with Cause Number 54-C01-0907-PL-240).

### (f)    Count VIII (Unjust Enrichment)

To recover under a theory of unjust enrichment a party must show that a measurable benefit has been conferred on a party under such circumstances that retention of the benefit without payment would be unjust. *Dominiack Mechanical, Inc. v. Dunbar*, 757 N.E.2d 186, 190 (Ind.Ct.App.2001).   Nikish has acknowledged that it was not allowed to use information or technology that Nikish had developed while working with Manatron between 2001 and 2005. (Bharwani Deposition, p. 27).   By misappropriating Manatron's software and information to create an unauthorized derivative work, Nikish has unjustly received a benefit for which Manatron is entitled to payment.

### (g)    Count IX (Deception)

According to the Indiana Supreme Court, the elements of actual fraud are: "(i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false (iii) which was made with knowledge or reckless ignorance of the falseness (iv) was relied upon by the complaining party and (v) proximately caused the complaining party injury." *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind.1996).   The elements of criminal deception under Indiana Code 35-43-5-3(a)(2) are the same as the elements of fraud.   According to the statute, "[a] person who . . . knowingly or intentionally makes a false or misleading written statement with intent to obtain property, employment, or an educational opportunity . . . commits deception, a Class A misdemeanor." Ind. Code § 35-43-5-3(a)(2).   The evidence used above to establish copyright infringement and unfair competition also establishes deception.

(h)     **Count X (Conversion)**

The elements necessary to establish a civil cause of action for conversion are found in the criminal conversion statute, although a plaintiff in a civil conversion action is required to prove those elements only by a preponderance of the evidence. *Anderson v. Indianapolis Indiana AAMCO Dealers Adver. Pool*, 678 N.E.2d 832 (Ind.Ct.App.1997), trans. denied.   Indiana's criminal conversion statute defines conversion as the knowing or intentional exertion of unauthorized control over the property of another.   Indiana Code § 35-43-4-3; *McKeighen v. Daviess County Fair Board*, 918 N.E.2d 717, 723 (Ind.Ct.App.2009).   Nikish has acknowledged that it was not allowed to use information or technology that Nikish had developed while working with Manatron between 2001 and 2005.   (Bharwani Deposition, p. 27).   Mr. Bharwani stated that he should have the program of Manatron because he was the developer and that he had worked and developed on a program so had a sense of entitlement."   (V. Norris Deposition, pp. 19, 62).   And Nikish still possesses MVP information and technology.   "The final copies of the Pennsylvania and Maryland source code are being held by Susan Kornfield, [Nikish's] business attorney."   (Nikish's Response to Request for Production No. 26, pp. 9-10).   The evidence used above to establish copyright infringement also establishes conversion.

## <u>CONCLUSION</u>

Manatron is entitled to an Order denying Nikish's Motion for Summary Judgment regarding Manatron's copyright infringement counterclaim because Nikish sent Dr. Austin February 2010 RMS software source code for review, not what existed in December 2006 or was delivered to Clinton County in April 2007.   Manatron is entitled to an Order denying Nikish's Motion for Summary Judgment regarding Manatron's remaining counterclaims because Nikish failed to establish the absence of genuine issues of material fact for each and Manatron has established the existence of genuine issues of material fact.

FROST BROWN TODD LLC

By:   /s/ Joel E. Tragesser
James Dimos, #11178-49
Joel E. Tragesser, #21414-29
Richelle M. Harris, #26401-49
Attorneys for Defendant/Counter-Plaintiff
Manatron, Incorporated

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2010, a copy of the foregoing was filed electronically.   Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

**J. Lee McNeely**                          **G. Christopher Bernard**
**Brady J. Rife**                             **Susan M. Kornfield**
MCNEELY STEPHENSON THOPY & HARROLD          BODMAN LLP
jlmcneely@msth.com                          cbernard@bodmanllp.com
bjrife@msth.com                             skornfield@bodmanllp.com

/s/ Joel E. Tragesser

FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
Phone: 317-237-3800
Fax: 317-237-3900
jdimos@fbtlaw.com
jtragesser@fbtlaw.com
rharris@fbtlaw.com

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Affidavit of G. William McKinzie |
| 2 | Affidavit of Jacqueline R. Clements |
| 3 | Affidavit of Marty Ulanski |
| 5 | Declaration of Kishin J. Bharwani, Docket No. 125 |
| 6 | Excerpts from Deposition of Barbara Conner |
| 7 | Excerpts from Deposition of Daniel Wimpelberg |
| 8 | Excerpts from Deposition of Jacqueline R. Clements |
| 9 | Excerpts from Deposition of Kishin Bharwani |
| 10 | Excerpts from Deposition of Vicki Norris |
| 11 | Excerpts from Deposition of Will Norris |
| 12 | Manatron's December 1, 2006 letter |
| 13 | Affidavit of Michael A. Beard |
| A | Nikish's Agreement with Clinton County |
| B | Nikish's Answers to Interrogatories |
| C | Nikish's Response to Request for Production |
| D | Nikish's Tippecanoe County Proposal (Nikish 63-119) |
| E | Nikish's Vigo County Proposal (Nikish 201-234) |
| G | Nikish's October 30, 2006 letter to Jacque Clements |

997719v2