**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **NIKISH SOFTWARE CORPORATION** | ) | |
| **AND KISHIN BHARWANI,** | ) | |
| | ) | |
| **Plaintiffs/Counterdefendants,** | ) | |
| | ) | **Case No. 1:07-cv-0358-TWP-DML** |
| **vs.** | ) | |
| | ) | |
| **MANATRON, INC.,** | ) | |
| | ) | |
| **Defendant/Counterclaimant.** | ) | |


<u>**ENTRY ON MOTION FOR SUMMARY JUDGMENT**</u>

This copyright infringement matter is before the Court on Plaintiffs/Counterdefendants'

Motion for Summary Judgment.  Plaintiffs/Counterdefendants Nikish Software Corporation

("<u>Nikish</u>") and Kishin Bharwani filed a complaint against Manatron Corporation ("<u>Manatron</u>")

based on a letter that Manatron disseminated to Indiana county auditors relating to Nikish's tax

software.  Over a year and a half later, Manatron counterclaimed alleging, among other things,

that Nikish's tax software is an unauthorized derivative copy of Manatron's own tax software.

Nikish and Mr. Bharwani's Motion argues that summary judgment is warranted on all counts in

Manatron's Counterclaim.  For the reasons set forth below, Nikish and Mr. Bharwani's Motion

for Summary Judgment [Dkt. 116] is **GRANTED** in part and **DENIED** in part.  Specifically, the

Motion is **GRANTED** with respect to Count I (Misappropriation of Trade Secrets); Count II

(Breach of Contract); Count IV (Copyright Infringement); Count V (Breach of Fiduciary

Duty/Confidentiality); Count VI (Breach of Duty of Good Faith and Fair Dealing); Count VII

(Tortious Interference with Contractual Relationships or Business Expectancy); Count VIII

(Unjust Enrichment); Count IX (Deception); and Count X (Conversion).  The Motion is

**DENIED** with respect to Count III (Unfair Competition).


# I.  BACKGROUND

**A.    Nikish & Manatron Develop a Business Relationship**

This dispute arises out of a competitive business relationship between two tax software developers – Nikish and Manatron.  Manatron provides property tax software, appraisal, and other services to state and local governments.  Nikish develops software in the field of real estate, including tax software for use by local governments.  The parties did not always have a contentious relationship.  Before becoming adversaries in the tax software market –  and the courtroom –  Manatron and Nikish collaborated on numerous business ventures.

The parties' relationship began in 2001 when Nikish and Manatron entered into a contract requiring Nikish to develop tax accounting software for Manatron to deliver to Dauphin County, Pennsylvania (the "Dauphin County contract").  In 2003, the parties entered a similar agreement for a property appraisal and tax system in Baltimore, Maryland (the "Baltimore contract"). During the course of these ventures, Nikish had access to Manatron's MVP software source code ("MVP") "for the purposes of modifying it to deploy in those jurisdictions." Whether or not Nikish exploited this access to infringe MVP source code lies at the heart of the present dispute.

**B.    Nikish & Manatron Part Ways; Nikish becomes a Rival in the Indiana Marketplace**

By the middle of the decade, the parties' relationship had deteriorated.  On or about October 14, 2005, the parties entered into an agreement voiding all duties and obligation owed under the Baltimore contract. However, at this time, Nikish continued to provide services under the Dauphin County contract.

Soon after the Baltimore contract was terminated, Nikish began developing software called RMS 2.0 ("RMS").  By early 2006, Nikish had begun marketing RMS to Indiana counties, including Bartholomew County and Clinton County.  William Norris, a deputy auditor who attended a Bartholomew County presentation, testified that Nikish's presentation incorporated "screen shots from a Dauphin County program."  Vicki Norris, who was also in attendance, testified that Manatron was mentioned at the presentation as an inferior competitor.  Moreover, at the time Nikish made these presentations, the RMS software had not been fully completed and was a work in progress.  Nonetheless, Nikish eventually completed the software and found a Beta site, Clinton County, to help with the completion of RMS.  Nikish and Clinton County signed an agreement in February 2007 and Nikish installed RMS in April of that same year.

## C.     Manatron Suspects Infringement & Reacts

Prior to this achievement, however, Manatron fired the shot leading to the present dispute.  Specifically, on December 1, 2006, after Manatron learned that Nikish was marketing RMS to Indiana counties, Manatron sent a letter to a number of Indiana county auditors, asserting that it had "credible evidence" that RMS was a "misappropriated derivative copy" of Manatron's MVP software, meaning "Manatron would own it and any offer or sale of RMS 2.0 by Nikish would be illegal."  In a not-so-subtle fashion, Manatron suggested that any county that entered into a license agreement with Nikish would face legal and operational gridlock.  From Nikish's vantage point, however, Manatron's letter was a transparent ploy to fend off new competition in the Indiana marketplace.

According to William McKinzie, President and CEO of Manatron, the "credible evidence" cited in the letter stems largely from Nikish's proposal to Vigo County, which it made

on August 30, 2006.  Mr. McKinzie summarized this evidence as follows:

> **Given the time frame it would take to develop a product from the ground up for the market, the financial position of Nikish software being inadequate to muster the type of funding for a ground up build out of Indiana software, our knowledge of the Nikish operating structure and performance ability, the use of naming conventions, the use of former Manatron personnel intimately familiar with the MVP code and Nikish's possession of the MVP code we concluded that the product being offered in Indiana as RMS 2.0 was a derivative work of MVP.**

In other words, based on this evidence, Mr. McKinzie concluded, "the only way [Nikish] could have offered software to the Indiana client base was to misappropriate the Manatron intellectual property it had access to."

Manatron also directs the Court to the particular verbiage that Nikish used in its various proposals to Indiana counties.  In the Vigo County proposal, Nikish highlighted that "Nikish [] has built Tax Systems as a subcontractor to a larger company.  We have recently launched our own Tax Product tailored to the Indiana market."  The proposal also stated, "Nikish Software is committed to providing Indiana Counties with a State of the art, functionally rich Tax Solution. In this effort we have made a commitment to ***adapting* our tax product for Indiana**." (emphasis added).  Later, in June 2007, after Manatron's saber-rattling letter, Nikish submitted a proposal to Tippecanoe County containing revised language, replacing the word ***adapting*** with the word ***creating***.  Manatron deems this modification significant.

### D.    Nikish & Manatron Begin Litigating

Not long after Manatron's letter, the parties began litigating.  On March 15, 2007, Manatron sued Nikish in the Western District of Michigan, alleging that Nikish failed to fulfill its obligations under the Dauphin County contract.  Two years later, the parties settled this action, and the Western District of Michigan entered an order dismissing all of Manatron's

claims with prejudice.

In the meantime, on February 15, 2007, Nikish had filed this present action against Manatron for: (I) Tortious interference with a business relationship and/or contract; (II) Defamation of Nikish; (III) Defamation of Mr. Bharwani individually and in his capacity as President and CEO of Nikish; and (IV) Breach of Contract.  Almost one and a half years after Manatron filed its answer, on September 15, 2008, Manatron filed a motion for leave to assert a counterclaim for injunctive relief and damages.  This Court granted that motion.  Manatron's counterclaims included various causes of action: (I) Misappropriation of trade secrets; (II) Breach of contract; (III) Unfair competition; (IV) Common law copyright infringement; (V) Breach of fiduciary duty/confidentiality; (VI) Breach of duty of good faith and fair dealing; (VII) Tortious interference with contractual relationships or business expectancy; (VIII) Unjust enrichment; (IX) Deception; and (X) Conversion.  These counterclaims are the subject of the present Motion for Summary Judgment.

**E.      The Discovery Plan & Dr. Austin's Conclusion**

After a discovery impasse relating to the exchange of source codes, the parties conferred with the Magistrate Judge and agreed to an innovative discovery plan to jointly hire an expert who would compare the parties' respective source codes ("Joint Discovery Plan").  Specifically, Manatron would select and produce portions of MVP source code and Nikish would produce source code for RMS's corresponding features and functions.  The parties then agreed that the expert's findings regarding similarity between the codes would be "presumptively binding upon both parties in the absence of clear error."  The parties also fashioned mutually agreeable instructions that would guide the expert's review of the source codes.  The instructions clarified

that the purpose of the expert's review was to determine, once and for all, "if RMS is original to Nikish, or whether it embodies creative expression owned by [Manatron] in its MVP software." Because copyright law does not protect certain elements of software, the instructions spelled out items of no legal import for purposes of a copyright infringement analysis. By way of example, if the law requires specific features and function for software used to assess property taxes, these features and functions would not be considered legally relevant similarities for purposes of the expert's infringement analysis, because both RMS and MVP would necessarily share these required features. In copyright parlance, these features are an "externality," not evidence of copying original expression.

The parties finalized instructions, agreed on an expert (Dr. Todd Austin ("Dr. Austin"), Professor at the University of Michigan Department of Electrical Engineering and Computer Science) to examine the source codes, and produced their respective source codes. After comparing the codes in accord with the parties' instructions, Dr. Austin concluded that there are no *legally relevant* similarities between RMS and MVP. The only similarities between the programs, Dr. Austin found, are legally irrelevant and spring from the fact that both software programs essentially carry out the same basic functions relating to property tax management. For purposes of an infringement determination, Dr. Austin's conclusion was clear: "In summary, I was unable to find any relevant similarities between the RMS and MVP code bases."

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56© provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d

487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews

"the record in the light most favorable to the nonmoving party and draw[s] all reasonable

inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation

omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest

on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is

a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490 (citation

omitted).  "In much the same way that a court is not required to scour the record in search of

evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on

the merits of a claim."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and

internal quotations omitted).  Finally, "neither the mere existence of some alleged factual dispute

between the parties nor the existence of some metaphysical doubt as to the material facts is

sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*,

129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).


### III.  DISCUSSION

Dr. Austin's presumptively binding conclusion notwithstanding, Manatron argues that

Nikish's RMS software is an unauthorized "derivative work" of Manatron's MVP software. *See*

17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works, such

as a translation, musical arrangement . . . or any other form in which a work may be recast,

transformed or adapted .").  The linchpin of Manatron's argument against summary judgment on

7

the copyright infringement claim is that Dr. Austin's report is irrelevant, non-binding, and clearly erroneous because it is not based on RMS as it existed in 2006 or 2007 (the years Nikish began marketing and selling RMS, and therefore the operative time period for infringement purposes). "Instead, there is compelling evidence that Nikish submitted to Dr. Austin a version of the RMS software that had been substantially rewritten since Nikish delivered it to Clinton County in 2007." [Dkt. 132 at 2]. In other words, Dr. Austin's report is clearly erroneous because Nikish pulled a high-tech bait-and-switch, thus creating genuine issues of material fact that preclude summary judgment on the infringement claim. Moreover, Manatron emphasizes that Dr. Austin's report is not dispositive of the other nine counts in its Counterclaim against Nikish.

### A.      Manatron's Copyright Infringement Claim

As an initial matter, Count IV of Manatron's counterclaims, which alleges "common law copyright infringement," is preempted by 17 U.S.C. § 301 of the federal Copyright Act. As the Seventh Circuit has confirmed, federal law governs copyright infringement claims like the one Manatron asserted. *See Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.*, 805 F.2d 663, 674 n.20 (7th Cir. 1986) ("[17 U.S.C. § 301] expressly preempted rights under state law that are equivalent to any of the bundle of rights encompassed by a federal copyright."). Manatron's "common law" copyright infringement allegations – which relate to Nikish's unauthorized creation, reproduction, and distribution of a derivative work – are covered by 17 U.S.C. § 106. Specifically, § 106 recognizes six rights of copyright holders: (1) the right to reproduce the works; (2) the right to prepare derivative works; (3) the right to distribute copies of the works; (4) the right to publicly perform the works; (5) the right to publicly display the

works; and (6) the right to perform the works by means of a digital audio transmission.  Thus, Count IV of Manatron's Counterclaim must be analyzed under the federal Copyright Act.

Under federal law, to establish infringement, two elements must be proven: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991) (emphasis added).  Nikish does not dispute that Manatron owns MVP software.  Thus, Manatron must only prove the second element: copying.

Manatron can prove that Nikish copied MVP in one of two ways: (1) by direct evidence or (2) by inference that copying must have occurred because "the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *JCW Invs. v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007) (citations and internal quotations omitted).  "The test for substantial similarity may itself be expressed in two parts: whether the defendant copied from the plaintiff's work and whether the 'copying,' if proven, went so far as to constitute an improper appropriation." *Incredible Techs, Inc. v. Virtual Techs, Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (citations and internal quotations omitted). Dr. Austin was hired to make this determination.  Nevertheless, Manatron claims that it should survive summary judgment under either method because both methods reach the same conclusion: That is,  Nikish submitted a 2010 version of RMS, which is markedly different than the 2006-2007 version of RMS, thus rendering Dr. Austin's conclusion irrelevant.

To determine infringement in the context of software, courts often employ an "abstraction-filtration-comparison" methodology. *See, e.g., Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992).  This methodology jettisons extraneous unprotected

elements of software until only the core protected material remains. This distilled "golden nugget" is what is protected by the copyright laws. *Id*. at 710. Dr. Austin employed an iteration of this methodology when he determined that there are no *relevant* similarities between RMS and MVP.

1.  **Manatron's Evidence of Infringement**

Manatron trumpets numerous pieces of evidence purporting to create genuine issues of material fact precluding summary judgment. Manatron's evidence consists of the following: (1) the deposition of Daniel Wimpelberg, a former Nikish employee; (2) the deposition of Vicki Norris, a former Nikish contractor; (3) the deposition testimony of individuals who observed Nikish's RMS presentations; and (4) Nikish's own statements and documents.

First, Manatron argues that Mr. Wimpelberg's testimony bolsters the theory that Nikish pulled a bait-and-switch. The relevant excerpt of his deposition follows:

> **Q. Were you present when Nikish Software employees discussed a request from Manatron for computer software to be submitted to a computer expert for analysis?**
>
> **A. Was I in the meeting directly, no, but I heard discussions about it.**
>
> **Q. What discussions did you hear about Manatron's request that Nikish Software submit –**
>
> **A. Just that they were requesting a sample of software for review by an expert. Inter-employee discussions.**
>
> **Q. What discussions did you hear about that request?**
>
> **A. Well, just, you know, pretty much that's it.**
>
> **Q. Did Mr. Bharwani, Mr. Tucci discuss whether they were pleased with the request?**
>
> **....**

10

**A. Yes.**

**Q. And what did they say?**

**A. <u>They couldn't have picked a better set of code to review</u>, something very similar to that.  I don't know if those are the exact but very similar.**

**Q. Did they explain to you or during those discussions why there couldn't have been a better –**

**A.  Because that code was <u>already rewritten</u>.**

**Q.  Excuse me?**

**A.  Because the code was already rewritten.**

**Q.  What do you mean it was already rewritten?**

**A.  We were rewriting the entire code base for Franklin County.**

**Q.  Were you rewriting the entire code base for Franklin County because of the lawsuit with Manatron?**

**A Not to my knowledge.**

(emphasis added).  Mr. Wimpelberg also testified that a letter "N" was added to the tables and fields in the RMS database.  Initially, Mr. Wimpelberg testified that the "N" was included to "mask" the differences between RMS and MVP.  However, he later walked back this testimony, ultimately stating, "I don't know if the word *mask* was used." (emphasis added).  The following exchange is Mr. Wimpelberg's clearest explanation of the "N" issue:

**Q: [I]s that a correct recitation of your testimony, that someone told you the N's were used to mask Nikish's product?**

**A. That I – they were told – I was told that the N's were put in front of the names so that they would – so that <u>it would identify them as Nikish Software's product because he was being sued by Manatron</u> right now and there is some sort of question about the source of everything, you know, source code, databases, whatever.**

11

Second, Manatron highlights various excerpts of Vicki Norris' testimony.  Specifically,

Mrs. Norris testified:

> **Yes, [Bharwani] developed a program that was used in another county,
> and that was presented in Indiana until he received information from
> Bartholomew County, as far as the abstract with Indiana data.  So that
> had to be developed someplace else.**

Nikish asked Mrs. Norris an additional question on this topic:

> **Q: The question I'm asking you is this, did Mr. Bharwani ever tell you
> that he used some other program to develop the program he was
> marketing in Indiana?**
>
> **....**
>
> **A Yes, sir. That it was his, that he wrote it. And that <u>he had a sense of
> entitlement to it</u>. And it was basis for, and then adapted to this county
> that he made a presentation of, and then was <u>continued to adapt</u>.**

Further, Bharwani told Mrs. Norris that he "had inside sources all over" Manatron.  Last,

Manatron highlights that when Nikish asked her whether this statement was related to the copying

of software, Mrs. Norris stated, in relevant part:

> **I was always being told that he had an in at Manatron and an in at ARC
> that was doing this and doing that and telling him to watch this, watch
> that, do this, do that. And, basically, that what I had to say meant
> nothing, if anything had value to him.**

Third, Manatron insists that the testimony of individuals who attended Nikish's various

presentations bolsters its infringement claim.  Specifically, Will Norris, an employee of

Bartholomew County who attended the Bartholomew demonstration, testified that his "gut

feeling" was that the software demonstrated by Nikish looked similar to the MVP tax software.

Similarly, Barbara Conner, who attended the Clinton County demonstration, testified that

Nikish's tax software was "almost like" Manatron's.

12

Last, Manatron points to Nikish's own statements and documents in attempt to strengthen its case.  Manatron points to the affidavit of Mr. Bharwani, which states in relevant part, "I verify that the RMS 2.0 source code that I sent to Dr. Austin was <u>the current production version of RMS in use in Indiana</u>."  According to Manatron, this admission corroborates its bait-and-switch theory.  Further, Mr. Bharwani testified that he did not use any <u>protected</u> portions of Manatron's source code.  This statement, Manatron argues, amounts to a implicit admission that Nikish did in fact use portions of MVP.  According to Manatron, whether or not those particular portions were protected by law is not for Nikish or Mr. Bharwani to decide.

**2.      Assessment of Manatron's Evidence**

Simply stated, the Court is not persuaded by Manatron's arguments.  While some of the statements Manatron emphasizes may seem significant at first blush, their strength dissipates when viewed in context.  After the dust settles, Manatron is left with a handful of stray, almost cryptic statements.  Even when viewed cumulatively, these statements fail to create genuine issues of material fact as to infringement.

First, Mr. Norris and Ms. Conner's statements, which relate to *gut feelings* that RMS is *almost like* MVP, are practically meaningless, particularly given that neither person has any purported computer programming acumen.  On this point, Mr. Norris offered some colorful testimony, stating, "I wouldn't know software code if it bit me in the ass."  Moreover, common sense suggests that the programs will invariably look similar: After all, they carry out similar functions.  But this is precisely why the parties agreed to rely on Dr. Austin's expert analysis, not laymen's naked observations.  For purposes of infringement, mere similarity between products is not dispositive.  The similarities must be relevant under copyright laws.  Neither of

these statements hint at the possibility that the similarities between RMS and MVP relate to legally protected material.[1]

Next, the Court finds Manatron's reliance on Mr. Bharwani's affidavit statement and deposition testimony equally unavailing.  Mr. Bharwani's second affidavit [Dkt. 134-3] clarifies that although he submitted to Dr. Austin "the current production version of RMS in use in Indiana," this is the version that was installed in Clinton County in 2007, Owen County in 2008, and Delaware County in 2009.  Bharwani's affidavit further clarifies that Nikish has only changed RMS to the extent necessary to comply with new laws and customer specifications.  Mr. Bharwani states, "We made no revisions to RMS based upon any Manatron software."  Bharwani's affidavit concludes, "I certify that the current version of RMS provided to Dr. Austin and the versions of RMS as it existed in 2007 have these same characteristics, noted by Dr. Austin as being material differences between RMS and Manatron's MVP."

With these pieces of evidence effectively removed from the equation, the Court turns to the testimony of Mrs. Norris.  The Court agrees with Nikish that Mrs. Norris' testimony has little bearing on this case.  Mrs. Norris does not possess technical expertise, admitting "I don't know a code if it bit me."  Moreover, other than her indication that Bharwani felt a sense of entitlement to the software, her testimony offers very little in terms of straightforward substance.  However, when pressed point-blank on whether Nikish copied MVP, she did provide a relatively clear answer:

_____

[1]Because of software's inherent complexity, Manatron's reliance on the "ordinary observer" test is misplaced.  As Nikish persuasively argues, the abstraction-filtration-comparison test is better suited for determining infringement in the context of software.

**Q. Ma'am, I'm asking you, is it "yes" or "no," does this statement have anything to do with the development of software?**

**A.  I don't know.**

**. . .**

**Q.  Were you accusing Mr. Bharwani in that statement of using his Manatron sources to copy software?**

**A. I was accusing Mr. Bharwani of using his Manatron sources for whatever they had advised him of previously and heretofore.**

**Q. In what context, ma'am?**

**A.  I was not privy to that information. I cannot answer what I do not know.**

Mrs. Norris' vague insinuations notwithstanding, her testimony does not create genuine issues of material fact that Nikish copied MVP.

Finally, the Court agrees with Nikish that the value of Mr. Wimpelberg's testimony is exceedingly limited, given its context.  Mr. Wimpelberg conceded that he had never seen MVP's source code, had little exposure to the Indiana version of RMS, and did not see the code that Nikish sent to Dr. Austin.  Also, as explained above, Mr. Wimpelberg's testimony is clear that "N's" were added to the RMS database for identification purposes, not as a mechanism for concealing RMS's infringing features:

**Q. [I]s that a correct recitation of your testimony, that someone told you the N's were used to mask Nikish's product?**

**A. That I – they were told – I was told that the N's were put in front of the names so that they would — <u>so that it would identify them as Nikish Software's product because he was being sued by Manatron</u> right now and there is some sort of question about the source of everything, you know, source code, databases, whatever.**

Moreover, as a practical matter, Manatron does not try to explain how adding "N's" to RMS's

database could possibly shelter legally meaningful similarities from the analysis of Dr. Austin,

an expert in the field. Further, Mr. Wimpelberg's testimony that the code was "rewritten" is

belied – or at least contextualized – by later testimony:

> **Q. When you say completely re-written, how did that relate to the code going to the expert?**
>
> **A. If they're choosing the code, I'm assuming that -- <u>I don't know if they rewrote part of Indiana code</u>. I know that code was requested. Where that code base was coming from, I don't know. <u>Like I said, I was not privy to any single conversation between Kishin or anybody else in the company and anybody from Manatron, the court system or anybody else regarding where the software was coming from, what software was being requested or anything of the sort</u>.**
>
> **Q. Did Mr. Tucci in that conversation say the words rewritten or word rewritten?**
>
> **A. I want to do my best recollection of the conversation so I don't give you an incorrect answer. I don't know that he used the word rewritten. <u>I would say no</u>.**

Finally, to the extent the code was "rewritten," Mr. Wimpelberg clarified that this was done only

to tailor the product to a client's needs:

> **Q. What do you mean it was already re-written?**
>
> **A. We were rewriting the entire code base for Franklin County.**
>
> **Q. Were you rewriting the entire code base for Franklin County because of the lawsuit with Manatron?**
>
> **A. Not to my knowledge.**

All in all, the only thing that can be clearly gleaned from Mr. Wimpelberg's testimony is that

Nikish thought the RMS code selected was a "good choice for comparison." Such a statement is

not sufficient to create genuine issues of material fact as to whether Nikish infringed MVP.

Manatron advances the theory that, in effect, Nikish radically transformed RMS

16

sometime after 2006, thereby disguising its unlawful similitude to MVP.  This transformation was so great, in fact, that RMS successfully evaded infringement detection from Dr. Austin, an authority on the matter.  Plainly stated, this argument is grounded in inferential leaps, not admissible evidence.  Manatron's evidence that RMS has changed since 2006 is limited to indications that Nikish modified RMS  to comport with new laws and to tailor the product to customer specifications.  Even if Manatron had persuasive evidence that Nikish submitted a "past" version of RMS, Manatron still failed to offer any evidence that the "past" version is meaningfully different than the "present" version submitted to Dr. Austin.  Even drawing all inferences in favor of Manatron, no genuine issues of material fact exist as to Nikish's alleged infringement, and Dr. Austin's conclusion is binding on the parties.  Accordingly, this Court grants Summary Judgment on the issue of non-infringement by Nikish, Count IV of the Counterclaim (copyright infringement) is **GRANTED**.

## B.  Manatron's Other Claims

Nikish argues that like a house of cards, once the copyright infringement claim fails, the remaining counts in Manatron's Counterclaim necessarily suffer a similar fate, because they are all premised on virtually identical infringement allegations.  Predictably, Manatron disputes this argument, claiming that many of the counterclaims are independent of the infringement claim or contain an extra element beyond the infringement claim.  At bottom, if the Court is simply unable to discern a qualitative difference between the claim at issue and copyright infringement, summary judgment is appropriate under the circumstances.  The additional claims are analyzed as follows.

17

     **1.**     **Misappropriation of Trade Secrets (Count I); Tortious Interference with Contractual Relationships or Business Expectancy (Count VII); Unjust Enrichment (Count VIII); Deception (Count IX); & Conversion (Count X)**

Manatron's above claims are effectively its copyright infringement claim recast under a different banner.  The allegations in the misappropriation of trade secrets claim state, "Nikish misappropriated the MVP source code it had access to pursuant to the 2001 Pa. Software Development Agreement and the 2003 Baltimore Agreement in violation of the Agreements and without Manatron's consent" (Counterclaim ¶ 43), and "Nikish developed the RMS 2.0 using Manatron's confidential trade secret information[.] Manatron is the rightful owner of the RMS 2.0 as it was derived using Manatron's proprietary MVP source code." (*Id*. at ¶ 45).  The tortious interference allegations are essentially limited to, "Despite having knowledge of the continuing obligations and expectancies, Nikish interfered with Manatron's contracts, or its business expectancies, by <u>utilizing or disclosing Manatron's confidential or proprietary information to develop RMS 2.0</u>, which it then marketed and sold to Manatron's customer base, usurping sales opportunities from Manatron, and using Manatron's goodwill and confidential information to generate revenue for Nikish."(*Id*. at ¶ 86).  Manatron's unjust enrichment allegations are essentially limited to, "Nikish and Bharwani have enjoyed valuable benefits as a result of their business relationship and access to Manatron's confidential and proprietary information." (*Id*. at ¶ 89).  Manatron's deception allegations state, "Nikish, with the intent to defraud, misrepresented the source and quality of the RMS 2.0 product as its own, knowing that the RMS 2.0 is an illegal derivative of Manatron's MVP source code." (*Id*. at ¶ 95).  Finally, in its conversion claim, Manatron alleges, "Nikish used Manatron's confidential and proprietary information, namely its MVP source code, to create an illegal derivative copy – the RMS 2.0

product." (*Id*. at ¶ 99).  Because the crux of these claims is copyright infringement, the Court **GRANTS** Nikish's Motion for Summary Judgment.

### 2.    Breach of Fiduciary Duty (Count V)

Manatron premises its breach of fiduciary duty claim on the "business/contractual relationship" between Nikish and Manatron.  (*Id*. at ¶ 73).  However, Indiana does not recognize a fiduciary duty arising from an arm's length transaction. *See, e.g., Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000) ("Contractual agreements do not give rise to a fiduciary relationship creating a duty.").  The Court therefore **GRANTS** Nikish's Motions for Summary Judgment.

### 3.    Breach of Contract (Count II) & Breach of Duty of Good Faith & Fair Dealing (Count VI)

These claims relate to the Dauphin County contract.  Nikish argues that these claims were already dismissed *with prejudice* in the prior Michigan litigation between the parties, thus rendering them *res judicata*.  Indeed, in the Michigan litigation, Manatron asserted many of the same general allegations relating to breach of the parties' Dauphin County contract that now appear in this case.  The parties settled the Michigan action, and the Western District of Michigan entered an order dismissing all of Manatron's claims in that case with prejudice. "In Indiana, it is well settled that a dismissal with prejudice is a dismissal on the merits, and as such, it is conclusive of the rights of the parties and res judicata as to the questions that might have been litigated." *Mounts v. Evansville Redevelopment Commission*, 831 N.E.2d 784, 791 (Ind. Ct. App. 2005) (citation omitted).  Thus, Manatron's breach of contract claim, which stems from the

Dauphin County contract, is *res judicata*.[2]  Moreover, Manatron's claim for breach of the duty of

good faith and fair dealing is also *res judicata* because it arises squarely out of its breach of

contract claim.  *See Highway J Citizens Group v. U.S. Dep't. of Transp*., 456 F.3d 734, 741 (7th

Cir. 2006) (*Res judicata* bars not only the claims actually raised in the earlier suit, but also any

claims that could have been raised in that suit.). Because these counts in the Counterclaim match

the allegations anchoring claims that have been dismissed with prejudice in the Michigan action,

the Court **GRANTS** Nikish's Motion for Summary Judgment.

    **4.**      **Unfair Competition (Count III)**

    "The tort of unfair competition is premised upon the rationale that a person who has

builtup good will and reputation for his business is entitled to receive the benefits from his

labors. [Indiana] courts have held that such an interest is a property right deserving judicial

protection." *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport., Inc.*, 501 N.E.2d

458, 460-61 (Ind. Ct. App. 1986) (citations omitted).  "In alleging unfair competition, the

plaintiff is not required to show actual deception, but only that deception is the natural and

probable consequence of the tortfeasor's actions." *Id*. at 461.  Thus, under Indiana law, the tort

of unfair competition encompasses acts that may be considered "a fair and welcome part of

---

[2]At oral arguments held on December 3, 2010, Manatron's counsel countered that Section 6 of the "Settlement Agreement and General Release" specifically exempted all claims filed in this Indiana Action.  This argument was not made in Manatron's Response brief.  However, allowing these specific causes of action – virtually identical in substance to those at issue in the Michigan litigation – to proceed would allow Manatron a second bite at the apple, undercutting the overarching purpose of the Settlement Agreement: "The parties desire to settle the Action and to completely release each other in connection with the Action."  Common sense suggests that in order to give meaning to the Settlement Agreement, these claims cannot be exempted, as they comprised the basis of the Michigan dispute.  A contrary interpretation would abrogate the finality of the Western District of Michigan's order and render the Settlement Agreement a nullity.

vibrant competition," if they are engaged in "for the primary purpose of destroying a competing business." *Bartholomew County Beverage Co., Inc. v. Barco Beverage Corp., Inc.*, 524 N.E.2d 353, 358 (Ind. Ct. App. 1988) (unfair competition includes "palming" one's good or services as those of someone else).

      Although Manatron's unfair competition allegations are similar in nature to other claims disposed of above, Manatron arguably has a viable unfair competition claim grounded in allegations that "Nikish used Manatron software and projects to sell Nikish's software." [Dkt. 132 at 32-33]; *See also* Counterclaim ¶ 64 ("Nikish is unfairly competing in the marketplace and took these actions while being entrusted with Manatron's confidential and proprietary information."). William Norris, a deputy auditor who attended a Bartholomew County presentation, testified that Nikish's presentation incorporated "screen shots from a Dauphin County program." Drawing all reasonable inferences in Manatron's favor, this raises genuine issues of material fact as to whether Nikish passed off Manatron's products for its own. Accordingly, the Court **DENIES** Nikish's Motion for Summary Judgment as to Manatron's Unfair Competition claim.

## IV. CONCLUSION

      For the reasons set forth above, Nikish and Mr. Bharwani's Motion for Summary Judgment [Dkt. 116] is **GRANTED** in part and **DENIED** in part. Their Motion is **GRANTED** with respect to Count I (Misappropriation of Trade Secrets); Count II (Breach of Contract); Count IV (Copyright Infringement); Count V (Breach of Fiduciary Duty/Confidentiality); Count VI (Breach of Duty of Good Faith and Fair Dealing); Count VII (Tortious Interference with

Contractual Relationships or Business Expectancy); Count VIII (Unjust Enrichment); Count IX

(Deception); and Count X (Conversion).  Their Motion is **DENIED** with respect to Count III

(Unfair Competition).

      SO ORDERED:  12/08/2010

 

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**G. Christopher Bernard**
BODMAN LLP
cbernard@bodmanllp.com,mruvo@bodmanllp.com

**James Dimos**
FROST BROWN TODD LLC
jdimos@fbtlaw.com,award@fbtlaw.com

**Richelle Marie Harris**
FROST BROWN TODD LLC
rharris@fbtlaw.com,jtheal@fbtlaw.com

**Susan M. Kornfield**
BODMAN LLP
skornfield@bodmanllp.com,mpoupard@bodmanllp.com

**J. Lee McNeely**
MCNEELY STEPHENSON THOPY & HARROLD
jlmcneely@msth.com,emtindall@msth.com

**Brady J. Rife**
MCNEELY STEPHENSON THOPY & HARROLD
bjrife@msth.com,lsmanship@msth.com

**Joel E. Tragesser**
FROST BROWN TODD LLC
jtragesser@fbtlaw.com,saddington@fbtlaw.com