# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

NIKISH SOFTWARE CORPORATION AND
KISHIN BHARWANI,

,

      Plaintiffs,

v.

MANATRON, INC.

      Defendants.

_____/

MANATRON, INC.

      Counterclaimant.

v.

NIKISH SOFTWARE CORPORATION AND
KISHIN BHARWANI,

      Counterdefendants.

_____/

CASE NO. 1:07-cv-00358-TWP-DML

Honorable Tanya Walton Pratt
United States District Judge

Honorable Mark J. Dinsmore
United States Magistrate Judge

**BRIEF IN SUPPORT OF PLAINTIFFS-
COUNTERDEFENDANTS' MOTION
FOR ATTORNEYS' FEES AND
EXPENSES**

BODMAN LLP
Susan M. Kornfield (P41071)
G. Christopher Bernard (P57939)
201 South Division Street, Suite 400
Ann Arbor, Michigan  48104
Telephone: (734) 761-3780
Facsimile: (734) 930-2494
Attorneys for Plaintiffs - Counterdefendants

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................................i

CONTROLLING AUTHORITIES.......................................................................................ii

ISSUE PRESENTED...........................................................................................................iii

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND................................................................................................2

   1.  Manatron Threatened Every Potential Nikish Customer in Indiana.............................................2

   2.  Manatron Never Contacted Nikish or its Counsel, and Never Filed a Lawsuit to Protect its Copyrights......2

   3.  Manatron Had no Factual Basis to Allege Copying.............................................................3

   4.  Manatron Imagined Infringement....................................................................................3

   5.  Impact of Receiving the Blast Threat...............................................................................3

   6.  Disparity of Resources.................................................................................................3

   7.  Manatron Waits to Allege Infringement............................................................................4

   8.  The Threats of Copyright Infringement Continued...............................................................4

   9.  Manatron Agreed to a Process for Independent Expert Review of Source Code................................4

   10. Nikish Did not Copy Anything Owned by Manatron............................................................5

   11. Absence of Copyright Protection for Material Elements of Software.........................................6

   12. Manatron Pleaded and Pursued a Claim that has not Existed Since 1977....................................8

   13. Manatron Petitioned this Court for More Time to Try and Find Evidence to Support its Claims.............8

   14. Fees and Expenses have been Crippling..........................................................................10

LEGAL ANALYSIS............................................................................................................10

CONCLUSION....................................................................................................................17

# CONTROLLING AUTHORITIES

**Cases**

*Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.,*
   805 F.2d 663, 674 n.20 (7th Cir. 1986) ...................................................................... 8

*Computer Associates International, Inc. v. Altair, Inc.,* 982 F.2d 693 (2nd Cir. 1992).................. 7

*Feist Publications, Inc. v. Rural Telephone Service Co,* 499 U.S. 340 (1991) ............................ 6

*JCW Investments, Inc. v. Novelty, Inc.*, 509 F.3d 339 (7th Cir. 2007)........................................... 14

*Riviera Distributors, Inc. v. Jones,* 517 F.3d 926 (7th Cir. 2008), *citing*
   *Woodhaven Homes & Realty, Inc. v. Hotz,* 396 F.3d 822, 824 (7th Cir.2005).................... 11, 14

*Universal City Studios, Inc. v. Nintendo Co., Ltd,.* 797 F.2d 70 (2nd Cir. 1986) ......................... 16

*Yankee Candle Company, Inc. v Bridgewater Candle Company, LLC,*
   140 F.Supp.2d 111 (D. Mass 2001, *abrogated on other grounds by*
   *InvesSys, Inc. v. McGraw-Hill Cos., Ltd.,* 369 F.3d 16 (1st Cir. 2004).............................. 15, 16


**Statutes**

17 U.S.C §§ 101, 505............................................................................................................. 10

17 U.S.C §§ 102(b) ....................................................................................................... 8, 12

**ISSUE PRESENTED**

Where Nikish Software Corporation and Mr. Kishin Bharwani are the prevailing parties in this copyright infringement lawsuit, and where Manatron failed to provide any evidentiary support for the copying of its software, and where the parties had to hire an expert witness to determine that Nikish copied nothing owned by Manatron, should this Court award attorneys' fees and expenses Nikish and Mr. Bharwani?

Nikish Software Corporation and Mr. Bharwani answer "yes."

## INTRODUCTION

If ever there was a copyright case that required the full payment of attorneys' fees and expenses to the prevailing party, this is the case.  For a period of four years, Manatron Inc. has asserted its copyrights to threaten Nikish Software Corporation and its owner, Mr. Bharwani (collectively, "Nikish"), the customers of Nikish, the potential customers of Nikish, and every auditor in every county in Indiana.  The basis for these threats?  The bald-faced and unsupported assertion that Nikish copied the source code of Manatron.

Manatron later filed counterclaims of "common law" copyright infringement, trade secret misappropriation, breach of contract, breach of fiduciary duty/confidentiality, breach of duty of good faith and fair dealing, tortious interference with contractual relationships or business expectancy, unjust enrichment, deception, and conversion.  These theories had, as their predicate act, the alleged copying of Manatron source code.

At the time it made its first allegation of copying, Manatron had no evidence of any copying by Nikish.  Four years and hundreds of thousands of dollars later, it still has no evidence of copying.  It used its vastly superior resources and its threats and allegations of copyright infringement as a marketing tactic to try and destroy a start-up competitor.  It succeeded in frightening off Nikish customers and in saddling Nikish with significant legal fees.

Justice, and applicable law, compels an award of attorneys' fees and expenses.

1

## FACTUAL BACKGROUND

Because this case has been pending for a long time, the facts on which Nikish relies for an award of attorneys' fees are almost all in the record.  The additional facts are set forth in the Declaration of Susan M. Kornfield, attached as Exhibit A.  The key facts are:

**1.**      **Manatron Threatened Every Potential Nikish Customer in Indiana.**

On December 1, 2006, after Manatron learned that Nikish was marketing its proprietary software, RMS, to Indiana counties, Manatron sent a letter to 92 Indiana county auditors, asserting that it had "credible evidence" that RMS was a "misappropriated derivative copy" of Manatron's MVP software.  Manatron stated that "any offer or sale of RMS 2.0 by Nikish would be illegal." It further threatened that any county that entered into a license agreement with Nikish would face "legal and operational gridlock."  *See* Complaint at ¶ 18; Appendix A, Manatron Letter Dated December 1, 2006.

**2.**      **Manatron Never Contacted Nikish or its Counsel, and Never Filed a Lawsuit to Protect its Copyrights**.

At the time Manatron sent out the blast threat, above, it had an existing relationship with Nikish.  Nikish was providing telephone technical support to a customer of Manatron on a month-to-month basis.  *See* "Entry on Motion for Summary Judgment," Dkt. No.139 Filed 12/8/2010 ("Order"), p.2.  If Manatron genuinely believed that Nikish had infringed its copyright, Manatron could have contacted Nikish (for example, with a cease and desist letter, or a letter directly threatening litigation), or contacted counsel for Nikish (especially, as here, when Manatron had been in regular contact with counsel for Nikish for years), or could have filed a copyright infringement claim.  But Manatron did none of these.

3.     **Manatron Had no Factual Basis to Allege Copying**.

Manatron has never been a licensee of Nikish's property tax system software, "RMS," and thus had no direct experience with RMS.  Manatron does not allege that it ever had access to or use of RMS.  Manatron had never seen RMS source code and thus had no firsthand knowledge as to whether any RMS code was copied from Manatron MVP code.   Manatron had no evidence from anyone who had been involved in the design or development of RMS that RMS contained Manatron source code.

4.     **Manatron Imagined Infringement**.

Manatron simply concluded that Nikish was a source code thief and that Manatron had the right to threaten potential customers of Nikish with legal and operational gridlock:

> "Given the quick delivery turnaround time provided in the response to RFP, Manatron's knowledge of Nikish's operating structure and performance ability, the use of naming conventions, the use of former Manatron personnel intimately familiar with the MVP code, and Nikish's possession of the MVP code through its business dealings with Manatron, it was clear to Manatron that Nikish's RMS 2.0 was a derivative work of Manatron's MVP source code."

Counterclaim ¶ 34.

5.     **Impact of Receiving the Blast Threat**.

The recipients of the blast threat were public employees responsible for selecting, or recommending the selection of, a new software vendor.  Everyone knows what happens when a prospective customer gets a letter such as Manatron's.  The prospective customer has to consider whether it wants a lawsuit along with its new software system.  Manatron's letter is the use of copyrights to affect competition in a manner outside the legal system.

6.     **Disparity of Resources**.

Manatron is part of a giant corporate enterprise valued at one point at hundreds of

millions of dollars.  Nikish has less than a dozen employees.  It does not, and did not, have the resources to respond in the marketplace in any manner proportional to the blast threat from Manatron.

       **7.**    **<u>Manatron Waits to Allege Infringement</u>**.

Manatron waited until the last minute to bring its allegations of copyright infringement into a legal venue.  On February 15, 2007, in an attempt to stop the misconduct of Manatron in the marketplace and to seek damages for Manatron's scurrilous assertions of software theft, Nikish filed this action for, *inter alia,* tortious interference with a business and/or contractual relationship and defamation.  *See* Complaint.  Manatron waited eighteen months to file its copyright claim, and even then, filed a claim for "common law copyright infringement," a cause of action that has never existed for software.  (Dkt. No. 40).

       **8.**    **<u>The Threats of Copyright Infringement Continued</u>**.

Until its threats of copyright infringement were tested, Manatron continued to use its copyrights and assertions of trade secret to attempt to scare away business from Nikish.  Counsel for Nikish attempted to assure a potential customer of Nikish, Warwick County, that the claims asserted by Manatron were not meritorious and that Warwick County should be highly confident that it could enter into a software license agreement with Nikish and have uninterrupted use of the RMS software. *See* Exhibit A, ¶ 10.  Warwick County declined to license RMS.

       **9.**    **<u>Manatron Agreed to a Process for Independent Expert Review of Source Code.</u>**

Nearly three years after this case was instituted, the parties worked with the Court's Magistrate Judge to agree upon a process where the source code for Manatron's MVP would be compared to the source code of RMS and an expert in computer science would issue an opinion

as to whether anything owned by Manatron was copied by Nikish.  *See* Joint Discovery Plan for Production of Source Code ("Joint Discovery Plan") (Dkt. No. 79).

Manatron had every opportunity to maximize the likelihood that the expert would find the copying by Nikish – Manatron identified the particular elements of MVP it wanted the expert to focus upon, Manatron selected the modules to be compared, Manatron agreed on the expert, Manatron agreed on the instructions to be given the expert, and Manatron agreed that the findings of the expert would be presumptively binding on the parties.  *Id.* at 6.

**10.**   **Nikish Did Not Copy Anything Owned by Manatron**.

The expert selected by the parties, Dr. Austin, concluded that there were no relevant similarities between RMS and MVP:

> In summary, I was unable to find any relevant similarities between the RMS and MVP code bases.  While a few overarching similarities do exist between the two code bases e.g., object-oriented programming style, use of decimal arithmetic, and incorporation of a database backend with an SQL interface), these similarities are indicative of many business-oriented applications.  The differences between the applications (e.g., use of different programming languages, employment of different code organizations and different levels of code factoring) provided more insights, suggesting that the two code bases do not have shared authorship.  In examining individual source code files in the RMS system, the majority of the files implement simple data routines, user interface, or functionality that could not be located in the MVP code base.  The remaining files implement functionality contained in the MVP code base, but in all cases the two implementations are markedly different, to the extent that in most cases what is contained in one file in the RMS code base is spread over many files in the MVP code base.

Expert Report of Prof. Todd Austin, Exhibit F to "Brief in Support of Motion of Plaintiffs-Counterdefendants Nikish Software Corporation and Kishin Bharwani Under Fed. R. Civ. P. 56 for Summary Judgment of Defendant's Counterclaim," (Dkt. No. 117) ("Expert Report") at 13-14.

11.    <u>**Absence of Copyright Protection for Material Elements of Software**</u>.

As detailed in the briefs in support of the Motion for Summary Judgment, and repeated briefly here, Manatron knew or its counsel should have known that copyright law protects only authorship, not function. "The *sine qua non* of copyright is originality." *Feist Publications, Inc. v. Rural Telephone Service Co,* 499 U.S. 340 (1991).

Accordingly, Manatron could not expect (and stipulated in the instructions to the expert) that copyright law would protect:

- Facts

- Data

- Unoriginal (standard, typical, ordinary) collections of facts or data

- Opinions

- Ideas

- Concepts

- Principles

- Processes

- Procedures

- Functions

- Systems

- Methods of operation

- Discoveries

- Algorithms

- Features, functions, and elements that can be written in just a few different ways (copyright does not permit a monopoly on expression)

- Content due to external requirements or constraints:
  - hardware requirements

- programming language
- database design
- data handling requirements
- efficiency
- legal requirements
- requirements from customers (as set forth in an RFP, for example)
- good design practices
- standard software practices
- increased stability of product
- market requirements

- Similarities due to the co-ownership of the parties of software referred to as "Tax Claim," including:

- User Interface /"look and feel"
- Process flow
- Database
- Table definitions
- Data tables
- Reports
- Data access methodologies, and
- Data routines

- Similarities resulting from the requirements of Indiana law, namely

The State of Indiana enacted 50-IAC 23-1, the goal of which is "To attain uniformity in property tax administration practices through the use of functionally equivalent computer systems in each county in the state." *See* Expert Report, Schedule C.

*See, for example,* 17 U.S.C. 102(b) and *Computer Associates International, Inc. v. Altair, Inc.,* 982 F.2d 693 (2nd Cir. 1992).

### 12.   Manatron Pleaded and Pursued a Claim that Has Not Existed Since 1977.

Count IV of Manatron's Counterclaim alleges "common law copyright infringement" by Nikish.  As Nikish previously argued in its brief in support of its Motion for Judgment on the Pleadings (Dkt. No. 74), and as the Court so found in its Order, page 8, Manatron's claim of infringement is preempted.  *See Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.,* 805 F.2d 663, 674 n.20 (7th Cir. 1986) ("[17 U.S.C. § 301 expressly preempted rights under state law that are equivalent to any of the bundle of rights encompassed by a federal copyright."].

This Court has now granted summary judgment to Nikish on that count, and all the other counts whose predicate acts are the acts of copying Manatron code.  Manatron could have withdrawn its claims after receipt of Nikish's Motion for Judgment on the Pleadings, the Expert Report, or Nikish's Motion for Summary Judgment.  It did not.  Manatron has forced Nikish to spend years and hundreds of thousands of dollars fighting a claim that does not exist as a matter of law and as a matter of fact.  Why act responsibly when Manatron could derive considerable marketing advantages from the pending litigation?

### 13.   Manatron Petitioned this Court for More Time to Try and Find Evidence to Support its Claims.

Nearly four years after Manatron sent out the blast threat, and after Nikish filed its Motion for Summary Judgment, Manatron asked this Court for more time to conduct discovery to oppose the Motion.  (Dkt. 121).  Under Rule 56(f) of the Federal Rules of Civil Procedure, Manatron represented to this Court that it had uncovered witnesses whose testimony would

support Manatron's counterclaims of copying of source code and Nikish's attempts to rewrite its own software.  This Court granted Manatron's motion.

Two months and thousands of dollars later, Manatron's witnesses amounted to the following testimony:

(a) Mr. Wimpelberg, a former Nikish employee, testified he had never seen Manatron's MVP source code, saw only glimpses of Nikish's Indiana product, and never saw the source code Nikish sent to the expert.  He was told to add the letter "N" to database fields in Nikish's Franklin County <u>Ohio</u> code (the only Nikish product he worked on) <u>*not*</u> because he was told to "hide" or "mask" code but because there was a lawsuit filed against Nikish (and each party was submitting code to the expert) <u>*to distinguish*</u> <u>*Nikish's code from Manatron's code*</u>.  Finally, despite the fact that counsel for Manatron gave him every opportunity to testify that the RMS code had been "rewritten," Mr. Wimpelberg stated that he could not testify that RMS had been "re-written."  Order at 11.

(b) Mr. Norris, a former Nikish employee, testified that he had a "gut feeling" RMS looked "similar" to MVP.  As to his competence on this subject, he admitted he had no computer programming acumen and said "I wouldn't know software code if it bit me in the ass."  Order at 13.

(c) Barbara Conner, who attended the Clinton County demonstration, testified that Nikish's tax software was "almost like" Manatron's.  She had no computer programming acumen and did not identify the elements that were "almost like" those of Nikish as elements of authorship.  Order at 12.

(d) Mrs. Norris, a former Nikish employee, also admitted she had no computer

programming acumen and, like her husband, would not know a source code "if it bit her." Order at 14.  Mrs. Norris testified as follows:  "I was always being told that he had an in at Manatron and an in at ARC that was doing this and doing that and telling him to watch this, watch that, do this, do that. And, basically, that what I had to say meant nothing, if anything had value to him."  Testifying further as to whether she had any information relevant to the development of software, she stated "I don't know. . . .I was not privy to that information. I cannot answer what I do not know." Order at 12, 14.

**14.    Fees and Expenses Have Been Crippling.**

The expenses incurred by Nikish to fend off the scurrilous assertions of Manatron have been crippling.  It has had to attempt to reach out to auditors in the State of Indiana to assure them that Manatron's unsupported and scurrilous assertions were false.  It had to hire counsel to defend against the claims of infringement and the eight additional theories of liability having the copying of code as their predicate act.  Nikish had to pay the travel costs and other expenses associated with Manatron's last minute witnesses who, as it turned out, were not competent to testify to the relevant issues.  Nikish paid half of Dr. Austin's expert fees (and its attorneys' fees associated with selecting the expert, negotiating with Manatron and working with the magistrate judge to formulate a source code review plan, and implementing the plan).  Nikish paid its attorneys' to respond to third party inquiries as to whether Nikish had stolen Manatron source code.

**LEGAL ANALYSIS**

This Court has the power to award attorneys' fees and expenses to Nikish as the prevailing party under the U.S. Copyright Act, 17 U.S.C §§ 101, 505 (the "Act"):

> "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."

The Court of Appeals for the Seventh Circuit has held "that the prevailing party in copyright litigation is presumptively entitled to reimbursement of its attorneys' fees. See, *Riviera Distributors, Inc. v. Jones,* 517 F.3d 926 (7th Cir. 2008), *citing Woodhaven Homes & Realty, Inc. v. Hotz,* 396 F.3d 822, 824 (7th Cir.2005).

We begin by noting that the evidence has shown that Manatron never had a factual basis to allege copyright infringement. Manatron has conceded that it never viewed or used RMS and did not have access to RMS code. Indeed, on December 3, 2010 during oral argument before this Court on Nikish's Motion for Summary Judgment, Manatron complained that it had never had the chance to review RMS source code. Manatron apparently forgot that the role of the expert selected by the parties was to review the proprietary and confidential source code of the parties so that such code would never be in the hands of their competitor.

Second, Manatron decided to use its claim of copyright in its software as a marketing tactic. It threatened every single potential customer of Nikish in the State of Indiana. Each and every auditor was notified that Nikish was a thief, that they would be sued by Manatron if their county licensed Nikish code, and there would be legal and operational gridlock if they did not obey Manatron's directive. Manatron has never denied the substance of that blast threat.

Third, Manatron has never *acted* as though its copyright was infringed. It waited years to assert a claim of copyright infringement, never moved for a preliminary injunction, relied upon a theory of "common law copyright infringement" that was abolished by Congress thirty years

ago, and could not drum up even one competent witness to support its allegations even after obtaining months of additional discovery.

Fourth, when the allegations of copyright infringement relate to a work such as a computer program whose entire reason for existence is to carry out one function after another, we expect counsel to have knowledge of copyright law sufficient to know that it will never be sufficient that the two programs accomplish the same function. It is black letter law that copyright will not ever protect function. *See* 17 U.S.C. § 102(b) . As set forth in the stipulated instructions to the expert, copyright is not going to protect much that is of value to the creator of a computer program, because it will not protect:

- Facts

- Data

- Unoriginal (standard, typical, ordinary) collections of facts or data

- Opinions

- Ideas

- Concepts

- Principles

- Processes

- Procedures

- Functions

- Systems

- Methods of operation

- Discoveries

- Algorithms

- Features, functions, and elements that can be written in just a few different ways (copyright does not permit a monopoly on expression)

- Content due to external requirements or constraints:

    - hardware requirements

    - programming language

    - database design

    - data handling requirements

    - efficiency

    - legal requirements

    - requirements from customers (as set forth in an RFP, for example)

    - good design practices

    - standard software practices

    - increased stability of product

    - market requirements

    - similarities resulting from the requirements of Indiana law, namely The State of Indiana enacted 50-IAC 23-1, the goal of which is "To attain uniformity in property tax administration practices through the use of functionally equivalent computer systems in each county in the state."

Bluntly put, that's a whole lot of functions and features that will not be protected as a matter of law, and that comprise virtually all the value of these two highly-functional programs. Here, additionally, Manatron knew that Nikish's code could not infringe if the similarities were derived from Tax Claim software, software in which intellectual property rights were co-owned. Manatron, at a minimum, should have dismissed its copyright infringement claim and the other claims requiring, as a predicate act, the copying of Manatron code.  But such a dismissal would have precluded Manatron's relentless pursuit of Nikish, a pursuit that, just two weeks before the oral argument on December 3, 2010, resulted in Manatron calling a county prosecutor in Ohio asking if the prosecutor was aware of any copying by Nikish of Manatron software.

The United States Supreme Court has provided four "equitable factors" to guide a judge's discretion in awarding fees under this statute: (1) frivolousness, (2) motivation, (3) "objective

unreasonableness, and (4) the "need in some cases to advance compensation and deterrence." *Fogerty v Fantasy, Inc.*, 510 U.S. 517, 534 n. 19 (1994). The Court stated that these factors must be faithful to the purposes of the Copyright Act, which is to encourage "the production of original literary, artistic, and musical expression for the good of the public." *Fogerty*, 510 U.S. at 524. These factors all support an award of attorneys' fees and expenses in this case.

The decision to award attorneys' fees and expenses is within the discretion of the court. The considerations are just that – considerations. Frivolousness and bad faith are not requirements. *JCW Investments, Inc. v. Novelty, Inc.*, 509 F.3d 339 (7th Cir. 2007) (award of $575,099.82 in attorneys' fees was reasonable in prosecution of copyright claim and defense of award of fees) ("When a [party] wins a suit and is entitled by statute to a reasonable attorneys' fee, the entitlement extends to the fee he reasonably incurs in defending the award of that fee. Otherwise the fee will undercompensate.").

In *Riviera Distributors, Inc. v. Jones, supra*, the Court of Appeals held that the defendant was the prevailing party in a copyright case over copying of source code. Defendant was a competitor of the plaintiff, and the relationship between the parties was quite contentious. Indeed, the court of appeals stated "Riviera and Midwest have been at each others' throats for years." *Id.* at 929. Riviera alleged unlawful copying and Midwest adamantly denied it. The parties had previously agreed that, for future disputes, they would have an independent expert analyze the source code. Riviera pursued the case and then voluntarily agreed to dismiss the case, with prejudice, long after the time period had expired to permit it to dismiss the case voluntarily. The court of appeals reversed the failure of the lower court to find Midwest to be the "prevailing party" and to award attorneys' fees.

Here, then, Nikish is inarguably entitled to an award of attorneys' fees where the allegation of copyright infringement was demonstrated to be false as a matter of fact, and where Manatron had failed to adduce any evidence whatsoever is support of copying.

Many courts have awarded attorneys' fees when allegations of copyright infringement were used to stifle competition.  In *Yankee Candle Company, Inc. v Bridgewater Candle Company, LLC*, 140 F.Supp.2d 111 (D. Mass 2001, *abrogated on other grounds by InvesSys, Inc. v. McGraw-Hill Cos., Ltd*., 369 F.3d 16 (1st Cir. 2004), defendant was awarded its attorney fees because the plaintiff Yankee Candle Company's "pursuit of this litigation has served not to defend any colorable copyright or trade dress claim, but to intimidate, discourage and financially damage an upstart competitor." *Id.* at 113-14.  The court granted Bridgewater's motion for summary disposition as to the copyright claim.

Applying the factors, the *Yankee Candle* court found that the suit was objectively unreasonable because of the "marked weakness" of Yankee Candle's claim.  *Id* at 116. "Substantial dissimilarities" existed between Yankee Candle's labels and Bridgewater's labels. *Id.*  Further, the court held that the award should "serve to deter Yankee Candle and other market leaders from bringing overly aggressive and meritless suits against their small competitors." *Id.* at 119.  The court stated that this factor is:

> "especially pertinent where, as here, a large industry leader brings unreasonable claims against a much smaller competitor.  Denying attorneys' fees in such cases encourages dominant players to bury competitors in meritless lawsuits intended to lower profit margins." *Id.* at 118.

Finally, the court held that the expenses in defending the suit went against the purpose of the Copyright Act.  The expense for Bridgewater was "substantial" and "cut into Bridgewater's profit margin tremendously, pushing it further into the red." *Id.*  The court stated:

> "Copyright defendants like Bridgewater must be permitted to mount meritorious defenses against the kind of claims brought here without fear of crippling fees.  An overly restrictive approach would ignore the realities of litigation and force small competitors to settle weak claims like Yankee's solely because the fight will be too costly to wage.  This result would hinder legitimate competition and would chill original artistic expression."  *Id.*

Thus, the court granted Bridgewater's motion for attorney fees under the Copyright Act.

*In Eagle Services Corp. v. H2O Industrial Services, Inc.,* 532 F.3d 620 (7th Cir. 2008), the Court of Appeals reversed the district court's refusal to award attorneys' fees to the defendant. In *Eagle Services,* four individuals left Eagle Services to form their own company, H2O.  Eagle suspected that H2O did not have a particular safety manual required by law and sent two individuals to H2O to pose as potential customers.  Although H2O later prepared its own safety manual, at that initial meeting H2O indeed showed the Eagle safety manual.  The Court of Appeals held that because H2O later prepared its own manual, no other customers were shown Eagle's safety manual, Eagle was deprived of no profits from H2O's actions, Eagle had no actual damages, and H2O could have purchased an OSHA-complaint safety manual for approximately $300, it was "apparent that the suit was filed in order to cramp the style of a competitor and perhaps warn off any other employee of Eagle who might have temerity to set up in competition with it," *id.* at 623.

The court found that the suit "was frivolous even if there was a copyright violation" because Eagle could never had thought the Indiana regulators would have shut H2O down – the regulators would have simply required H2O to acquire the $300 safety manual or write its own, a relatively easy task.  *Id.*  The suit was brought "almost certainly in bad faith . . .  a suit against a newer and probably smaller and weaker firm," and H2O was entitled to its attorney fees.  *Id.* at 24.

In *Universal City Studios, Inc. v. Nintendo Co., Ltd,.* 797 F.2d 70 (2nd Cir. 1986), defendant Nintendo was entitled to its attorney fees under the Copyright Act and the Lanham Act (15 U.S.C. § 1051 *et seq.*).  Universal argued that Nintendo's popular video game, Donkey Kong, infringed on Universal's rights in its production of the movie with a similar title, King Kong.  Universal sued Nintendo, threatened Nintendo's Donkey Kong licensees, and sent cease-and-desist letters to all of Nintendo's marketing licensees, restating the claims of infringement.

After Nintendo prevailed in the litigation, the court granted Nintendo an award of attorneys' fees under both the copyright and the trademark statutes.  First, the court held that Universal's threat of litigation against Nintendo's licensees was "not to adjudicate its trademark claim, but to coerce others into sharing their Donkey Kong profits." *Id.* at 75.  Further, the fact that the threat of litigation was not followed up with an actual lawsuit again many of the licensees suggested that Universal did not believe it had a legitimate claim. *Id.* at 76.  The $1.14 million in fees awarded under the Lanham Act and the $140,000 awarded under the Copyright Act were appropriate because there was a "substantial overtone in this case to warrant an inference that this suit was initiated as a competitive ploy." *Id.* at 77.

Nikish, a small company launching its first property tax program, has been seriously injured by Manatron's conduct.  Who knows how long it will take the marketplace to forget Manatron's cavalier "Nikish stole our code" allegations?  A first step in making Nikish whole is an award of attorneys' fees and expenses.

## CONCLUSION

Manatron's allegations of copying were objectively unreasonable, as Manatron conceded no access to RMS and thus no factual basis for having a good faith belief that the substantial similarity between the two property tax systems were due to reasons other than their being

property tax systems compliant with Indiana law.  Manatron used its claim of copyright to frighten off customers of Nikish.  Manatron could have dropped its case at many different points in the litigation but never did so.  It was deriving too much of a business advantage by telling prospects "You know, Nikish is being sued for theft of our software."

For the reasons set forth above, including the facts set forth in Exhibit A, Nikish requests that this Court award attorneys' fees and costs in the amount of $178,991.22.

Respectfully submitted,

s/ Susan M. Kornfield
BODMAN LLP
201 South Division Street, Suite 400
Ann Arbor, MI 48104
(734) 930-2488
skornfield@bodmanllp.com
(P41071)
December 22, 2010                    Attorneys for Plaintiffs/Counter-defendants

18

**CERTIFICATE OF SERVICE**


      I hereby certify that on December 22, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

J. Lee McNeely
James Dimos
Joel E. Tragesser
Brady J. Rife
Richelle Marie Harris


                              Respectfully submitted,

                              s/ Susan M. Kornfield
                              BODMAN LLP
                              201 South Division Street, Suite 400
                              Ann Arbor, MI 48104
                              (734) 930-2488
                              skornfield@bodmanllp.com
                              (P41071)
December 22, 2010               Attorneys for Plaintiffs/Counter-defendants

19