UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NIKISH SOFTWARE CORPORATION AND KISHIN BHARWANI, | )<br>)<br>) |
| Plaintiffs/Counterdefendants, | )<br>) Case No. 1:07-cv-0358-TWP-MJD |
| vs. | )<br>) |
| MANATRON, INC., | )<br>) |
| Defendant/Counterclaimant. | ) |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Manatron, Inc.'s ("Manatron") Motion for Summary Judgment. On December 1, 2006, Manatron sent a letter to a majority of the county auditors in Indiana, claiming that it had "credible evidence" that Nikish Software Corporation's ("Nikish") tax software was a "misappropriated derivative copy" of Manatron's own tax software, meaning "Manatron would own [the software] and any offer or sale of [the software] by Nikish would be illegal." In response, Nikish and its President and CEO, Kishin Bharwani ("Bharwani"), filed suit against Manatron for defamation, tortious interference with a business relationship, tortious interference with a contractual relationship, and breach of contract. For the reasons set forth below, Manatron's Motion for Summary Judgment (Dkt. 150) is **GRANTED in part** and **DENIED in part**.

**I. BACKGROUND**

A. **Nikish and Manatron work together – and then sever ties**

This dispute arises out of a competitive business relationship between two tax software developers – Nikish and Manatron. Manatron provides property tax software, appraisal, and

other services to state and local governments. Moreover, Manatron has a significant footprint in the Indiana market, providing some form of software and services to more than 80 Indiana counties. Nikish develops software in the field of real estate, including tax software for use by local governments. Before becoming adversaries in the market for tax software, Manatron and Nikish worked together on numerous ventures.

The parties' relationship formally began in 2001, when Nikish and Manatron entered into a contract relating to the development of software for a property appraisal and tax system in Dauphin County, Pennsylvania. The parties apparently completed their duties under this agreement without incident. In 2003, the parties entered a similar agreement for a property appraisal and tax system in Baltimore, Maryland. This agreement did not go as smoothly, and the parties' relationship soon began to fray. Accordingly, on October 14, 2005, the parties entered into a "Settlement, Release, and Business Service Agreement" to discharge all duties and obligations owed under the Baltimore contract ("Settlement Agreement").

Significantly, the Settlement Agreement terminated all non-compete and non-solicitation obligations between Nikish and Manatron. To that end, the Settlement Agreement expressly gave Nikish and Bharwani the freedom to do business with "any person or entity," regardless of any prior or potential relationship the third party may have had with Manatron. That said, Nikish was still bound by a duty not to disclose or reproduce Manatron's confidential and proprietary information, including its MVP tax software ("MVP").

Soon after the Baltimore contract was terminated, Nikish began developing its own tax software called RMS 2.0 ("RMS") to compete with MVP. In early 2006, Nikish began shopping RMS to various Indiana counties. On July 19, 2006, Nikish demonstrated RMS to employees of

Bartholomew County using various screen shots. At this time, however, RMS was still in a developmental stage, and was therefore demonstrated as a "work in progress."

In August 2006, Nikish responded to a Request for Proposal ("RFP") for Vigo County, Indiana by offering its RMS product. At the time of Nikish's response, Vigo County was one of Manatron's Indiana clients. Manatron ultimately learned that Nikish was marketing RMS after reviewing the Vigo County RFP response. According to Manatron, the response raised significant red flags and, for a variety of reasons, Manatron believed that Nikish's nascent RMS product was nothing more than a derivative work of its own MVP product. According to Manatron, five factors led to this conclusion: (1) "the quick delivery turnaround time provided in the response to RFP"; (2) "Manatron's knowledge of Nikish's operating structure and performance ability"; (3) "the use of Manatron naming conventions"; (4) "the use of former Manatron personnel intimately familiar with the MVP code"; and (5) "Nikish's possession of the MVP code through its business dealings with Manatron." (Dkt. 151 at 8).

**C.      Manatron's letter**

On December 1, 2006, Manatron sent a letter ("Letter") to 56 of its Indiana MVP customers – all Indiana county auditors or treasurers – as well as the Indiana Department of Local Government Finance ("DLGF"). In doing so, Manatron asserted the statement that is at the heart of the present dispute:

> **Rather this letter is being sent because Manatron also has credible evidence that the RMS . . . system itself is nothing more than a misappropriated derivative copy of the Manatron MVP system in Indiana. As such Manatron would own it and any offer or sale of RMS . . . by Nikish would be illegal.**

Moreover, Manatron warned that any purchase of RMS "would likely result in legal and

3

operational gridlock." The Letter was drafted by Marty Ulanski ("Ulanski"), Manatron's executive vice president of operations, with the input of other members of Manatron's executive team. To this day, Manatron contends that the Letter was factually accurate, fair, and reasonable. In Nikish's mind, of course, the Letter was nothing more than a transparent gambit to fend off competition in the Indiana market.

Prior to mailing the Letter, Manatron held intra-company discussions and reviewed Nikish's Vigo County RFP response, but did not contact Nikish or any of its agents because it felt that "any discussions would prove fruitless." When asked point-blank what investigation Manatron undertook prior to sending the Letter, Ulanski testified, "I got a copy of the RFP, we read the RFP, took it at face value and we deduced from our experience . . .that . . . there is no practical way that [Nikish] could enter the market in such a short period of time without having taken a derivative of our code."

Nikish contends that the threatening nature of the Letter deterred many Indiana counties from using RMS. Notably, the Letter has not been altogether fatal to Nikish's Indiana business prospects. For instance, on February 26, 2007, Nikish signed its first contract involving RMS with Clinton County, Indiana.

**D. Procedural history**

In March 2007, Nikish brought the present action against Manatron based on the Letter. On September 15, 2008, roughly one and a half years later, Manatron filed a motion for leave to assert a counterclaim for, among other things, copyright infringement. In doing so, Manatron alleged that RMS was nothing more than a misappropriated derivative copy of MVP. The Court ultimately disagreed, granting Nikish's motion for summary judgment as to Manatron's

copyright infringement claim and finding that "no genuine issues of material fact exist as to Nikish's alleged infringement." (Dkt. 139 at 17).[1] At all times, Nikish has maintained that RMS "is not derived in any way from" MVP or any other Manatron software. (Dkt. 156 at 4).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

---

[1]The Court did, however, deny Nikish's motion as to an unfair competition claim brought by Manatron. (Dkt. 139 at 22).

## III.  DISCUSSION

As mentioned, Nikish and Bharwani have brought four claims against Manatron: (1) tortious interference with a contractual relationship; (2) tortious interference with a business relationship; (3) defamation; and (4) breach of contract, specifically the Settlement Agreement. Each claim is addressed in turn below.

**A.  Tortious interference with contract**

The elements of an action for tortious interference with a contract are: (1) the existence of
a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Melton v. Ousley*, 925 N.E.2d 430, 440 (Ind. Ct. App. 2010) (citing *Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind. Ct. App.2000)).  Nikish and Bharwani's claim falters on the first element.  At the time of the Letter, Nikish did not have a single contract in place involving RMS.  Indeed, Nikish's first contract for RMS was not signed until almost three months *after* the Letter was disseminated, thus warranting summary judgment on this claim.

**B.  Tortious interference with a business relationship**

To prevail on its claim of tortious interference with a business relationship, Nikish and Bharwani must show: (1) the existence of a valid relationship; (2) defendant's knowledge of the existence of the relationship; (3) defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship. *Government Payment Service, Inc. v. Ace Bail Bonds*, 854

N.E.2d 1205, 1209 (Ind. Ct. App. 2006) (citing *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 n.21 (Ind. 2001)). In addition to these five elements, a claim of tortious interference with a business relationship "requires some independent illegal action." *Id*. (citing *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003)).

Nikish emphasizes that the "illegal action" requirement has been interpreted loosely by Indiana courts, encompassing a broad swath of claims. This is true. *See Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999) ("courts interpreting Indiana law have held that non-criminal illegal acts are sufficient"); *Reginald Martin Agency, Inc. v. Conseco Medical Ins. Co.*, 388 F. Supp. 2d 919, 931-32 (S.D. Ind. 2005). So, at first blush, Nikish appears to be on solid footing when it invites the Court to rule that defamation or breach of contract constitutes an "independent illegal action" for purposes of its tortious interference claim.

Upon closer examination, however, the Court is not persuaded. Indiana law appears settled that neither defamation nor breach of contract satisfies the "illegal action" requirement. *See Levee*, 729 N.E.2d at 222-23 ("case law does not support a finding that defamation constitutes illegal conduct."); *Melton*, 925 N.E.2d at 436 ("defamation does not satisfy the illegality requirement"); *Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1252 (N.D. Ind. 2005) ("breach of contract alone is not sufficient 'illegal conduct' for purposes of a tortious interference with business relations claim."); *Manufacturer Direct LLC v. DirectBuy, Inc.*, 2006 WL 2095247, at *9 (N.D. Ind. July 26, 2006) (same). Because Nikish and Bharwani's claim lacks this essential element, summary judgment is warranted on the claim of tortious interference with a business relationship.

**C. Defamation**

Because Nikish and Bharwani's respective defamation claims fail for the same reason, the Court will analyze them together.

*1. Indiana law on defamation*

Under Indiana law, a defamatory communication is one that "tends to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007) (citation and internal quotations omitted). A defamatory statement can be either defamatory *per se* or defamatory *per quod*. *Id.* "A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Id.* (citation omitted). Here, the Letter falls within the ambit of *per se* defamation because it alleges that Nikish engaged in misconduct in the realm of property tax software – Nikish's trade.

To maintain an action for *per se* or *per quod* defamation, a plaintiff must satisfy four elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Id.* at 596-97 (citation omitted). The key difference between defamation *per se* claims and defamation *per quod* claims relates to damages; that is, a *per se* plaintiff "is entitled to presumed damages as a natural and probable consequence of the *per se* defamation." *Id.* at 597 (citation and internal quotations omitted).[2] Finally, whether a communication is defamatory is a

---

[2] Nikish cites dicta from *Henry v. Moberly*, 51 N.E. 497, 500 (Ind. Ct. App. 1898) for the proposition that "[w]hen a communication is defamation per se, malice is presumed." (Dkt. 156 at 9). However, since then, the Indiana Court of Appeals has clarified that "[t]o maintain an action for defamation per se, the plaintiff still must demonstrate a communication with defamatory imputation, malice, and publication." *Newman v. Jewish Cmty. Ctr. Assn. of Indianapolis*, 875 N.E.2d 729, 739 (Ind. Ct. App. 2007) (citing *Tanoos*, 865 N.E.2d at 597).

question of law for the Court, unless the communication is susceptible to both a defamatory and a non-defamatory interpretation. *Id*. at 596.

### 2. *Actual Malice*

Because it is dispositive under the circumstances, the Court's analysis effectively begins and ends with the actual malice element of Nikish's defamation claim. Under Indiana law, "[a] private individual bringing a defamation action must show 'actual' malice in matters of public or general concern." *Poyser v. Peerless*, 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002) (citations omitted). Manatron argues that its Letter touched on matters of public concern because it was sent to government entities to inform them about potential legal issues surrounding property tax software. Donning a benevolent cap, Manatron highlights that "the public has an interest in the government potentially purchasing illegal property tax software." (Dkt. 151 at 17-18). The purity of Manatron's motives notwithstanding, its position is backed by some notable authority. *See Fadell v. Minneapolis Star & Tribune Co., Inc.*, 425 F. Supp. 1075, 1083 (N.D. Ind. 1976) ("The issue of taxes is, of course, an issue of intense public concern. How the tax assessor operates in carrying out his public trust is an area requiring the widest constitutional protection of free debate."); *Nexus Group, Inc. v. Heritage Appraisal Service*, 942 N.E.2d 119, 122 (Ind. Ct. App. 2011) (public issues include property tax assessments, the property tax system, and the way each county spends its funds).

It is worth noting that the fact that Manatron stood to benefit financially from the Letter is not particularly important. Indiana courts have ruled that statements about "public issues" need not be animated by altruism. *Id*. at 123 ("While this evidence . . . tends to show that Heritage may not have been acting solely out of concern for the well-being of the community by sending the

9

letter to the newspaper, we cannot conclude that it establishes that Heritage was not acting in good faith . . . That he also may have been motivated by self-interest makes him human, but does not necessarily mean that he acted in bad faith."). In light of this authority and Nikish's failure to forge a contrary argument in its response brief, the Court is persuaded that Manatron's Letter involved a matter of "public concern," thus triggering the actual malice requirement.

Actual malice exists when "the defendant publishes a defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not." *Poyser*, 775 N.E.2d at 1107 (citation and internal quotations omitted). As the Indiana Supreme Court has noted, "[t]o demonstrate reckless disregard, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication or proof that the false publication was made with a high degree of awareness of their probable falsity." *Journal Gazette Co., Inc. v. Bandido's Inc.*, 712 N.E.2d 446, 456 (Ind. 1999) (citations, internal quotations, and alterations omitted). Further, it is well-settled that "[r]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Poyser*, 775 N.E.2d at 1107 (citations and internal quotations omitted). A crucial factor in the actual malice determination is the defendant's state of mind, which "is a subjective fact that may be shown by indirect or circumstantial evidence." *Id.* (citation omitted). Significantly, actual malice must be shown by clear and convincing evidence and "[t]he question of whether there is sufficient evidence to support finding actual malice is a question of law for the court." *Id.* (citation omitted). Manatron argues that summary judgment is warranted because the Letter was not published with actual malice.

The thrust of Nikish's counter-argument is that Manatron's failure to undertake an

investigation prior to disseminating the Letter amounted to a reckless disregard for the truth. In fact, Nikish's subheading relating to actual malice states, "Manatron distributed the letter with reckless disregard of its veracity <u>because it conducted no investigation</u> prior to it being published." (Dkt. 156 at 9) (emphasis added). For all intents and purposes, this argument dooms Nikish's defamation claim; Indiana law appears well-established that mere negligence or failure to investigate is not sufficient to establish malice. *See Poyser*, 775 N.E.2d at 1108 ("the failure to investigate does not in itself establish malice"); *Shine v. Loomis*, 836 N.E.2d 952, 959 (Ind. Ct. App. 2005) (failure to investigate, and by implication, the undertaking of a less than thorough investigation into the truth of a publication, does not in itself establish malice, as required to support a claim for defamation); *Kitco, Inc. v. Corp. for General Trade*, 706 N.E.2d 581, 591 (Ind. Ct. App. 1999) ("negligence or failure to investigate is not sufficient to establish actual malice.") (citation omitted). Because Nikish's evidence is of an insufficient caliber to allow a rational jury to find actual malice by clear and convincing evidence, *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), summary judgment is warranted on Nikish and Bharwani's defamation claims.[3]

---

[3] Manatron argues that it is entitled to attorney's fees under Indiana Anti-SLAPP Act. *See* Ind. Code § 34-7-7-5; *Nexus*, 942 N.E.2d at 122 (statute is designed to combat "[s]trategic lawsuits against public participation (SLAPPs)," which are "meritless suits aimed at silencing a plaintiff's opponents, or at least diverting their resources."). Significantly, though, in order for the anti-SLAPP statute to apply, the act at issue must also be "taken in good faith and with a reasonable basis in law and fact." Ind. Code § 34-7-7-5. In the context of defamation law, "good faith" is defined as "a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable." *Nexus*, 942 N.E.2d at 122 (citation and internal quotations omitted). Here, even though this case ostensibly bear a strong resemblance to *Nexus*, the Court finds that it cannot conclude that Manatron acted in good faith as a matter of law (good faith is a distinct requirement from actual malice). Specifically, in *Nexus*, the defendant conducted research, analyzed data, and attended hearings to buttress its statements. Manatron took no similar actions. Accordingly, Manatron is not entitled to attorney's fees under the Anti-SLAPP Act.

**D.     Breach of contract**

To recover for a breach of contract under Indiana law, the plaintiff must prove that: (1) a contract existed; (2) the defendant breached the contract; and (3) the plaintiff suffered damage resulting from the breach. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007) (citation omitted).  In contract cases, the Court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties. *Trustcorp Mortg. Co. v. Metro Mortg. Co., Inc.*, 867 N.E.2d 203, 212-13 (Ind. Ct. App. 2007).  The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases. *Id*. at 213. Likewise, the Court must accept a contract interpretation that harmonizes provisions, not one that places provisions in conflict. *Id*.

Here, the parties dispute the meaning of various contract provision, but this is hardly unusual.  The law is well-settled that differing, self-interested interpretations do not create ambiguity. *See Ind. Dept. of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069 (Ind. Ct. App. 2001).  Instead, a contract is ambiguous only when it is "susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Id*. at 1069-70.  Absent ambiguity, the Court must give the contract terms a plain and ordinary meaning. *Id*. at 1070.

Nikish and Bharwani allege that by disseminating the Letter, Manatron breached Section 6.2 of the Settlement Agreement, which provides:

> Freedom to Contract.  Nikish and Mr. Bharwani, directly or through business
> entities in which they have an interest, are free to provide any business and

<blockquote>
consiting services to, and create any deliverables for, any person or entity. Without limiting the foregoing, the noncompetition provisions in the Contract, and in any other written agreement between the parties, are null and void. No contractual limitations in any contract between Manatron and a third party shall in any way limit the ability of Nikish and Mr. Bharwani to do business with such parties.
</blockquote>

(Emphasis added). Specifically, Nikish and Bharwani argue that Manatron's Letter "was a blatant attempt to violate Nikish and Bharwani's freedom to contract with Indiana's counties . . . by asserting false accusations and defamatory statements that would in effect deem Nikish and Bharwani unfit to do business with in Indiana." (Dkt. 156 at 25). Manatron counters that its Letter never mentioned the Settlement Agreement and, in any event, it was simply protecting its intellectual property rights as contemplated by Section 6.1 the Settlement Agreement, which provides:

<blockquote>
Trade Secret/Intellectual Property Obligations and Prohibition Against Copying of Software. As of the Effective Date, the sole post-Agreement and post-Contract restrictions upon Nikish and/or Mr. Bharwani are the obligations (a) not to use (except for the benefit of Manatron pursuant to this Agreement) or disclose to third parties the trade secrets or proprietary information of Manatron, including the deliverables under this Agreement, data models, notes, memoranda, plans, records, electronic mailings or reports, whether in digital/electronic or written form (b) not to reproduce copies of the software delivered by Nikish to Manatron relating to the Project/Nikish will turn over to Manatron copies of the current version of the software written for Manatron. Upon conclusion of the Go Live Services, Nikish shall destroy any copies in its possession of the software or other workproduct created by Nikish and in which Manatron owns the intellectual property rights, provided that Nikish shall be entitled to retain archive copies for evidentiary purposes.
</blockquote>

(Emphasis added).

In the Court's view, this is a difficult issue, as there is arguably some tension within these provisions. On one hand, if Section 6.2 – the "freedom to contract" provision – does not apply under these circumstances, then it is unclear if it has any real teeth. On the other hand, by

13

including Section 6.1, Manatron made clear that Nikish was not entitled to reproduce Manatron's intellectual property. On this point, Manatron argues that Section 6.2 cannot be read as an anti-disparagement provision that precluded it from writing to its customers.

The Court believes that, at this time, Nikish has the better argument. Through the Letter, Manatron arguably attempted to thwart Nikish's ability to perform under the "freedom to contract" provision. The Court's decision is informed by general principles embedded in the "doctrine of prevention." Under this doctrine, "if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused." 13 WILLISTON ON CONTRACTS § 39:3 (4th ed.). Along those lines, "[w]hether interference by one party to a contract amounts to prevention so as to excuse performance by the other party *and constitute a breach* by the interfering party is a question of fact *to be decided by the jury* under all of the proved facts and circumstances." (emphasis added). As the Restatement (First) of Contracts has recognized:

> Prevention or hindrance by a party to a contract of any occurrence or performance requisite under the contract for the creation or continuance of a right in favor of the other party, or the discharge of a duty by him, is a breach of contract, unless
>
> (a) the prevention or hindrance is caused or justified by the conduct of the other party, or
> (b) the terms of the contract are such that the risk of such prevention or hindrance as occurs has been assumed by the other party.

RESTATEMENT (FIRST) OF CONTRACTS § 315 (1932). While the prevention doctrine is not directly applicable, since excusing performance is not at issue, the Court believes that its general principles serve as useful guides under the unique circumstances at hand. In other words, Manatron arguably hindered Nikish's freedom to contract by disseminating the Letter, potentially amounting to a breach of Section 6.2. Thus, whether Manatron's conduct amounted to a breach

and, in a similar vein, whether Manatron's conduct was justified under the circumstances are questions for the jury. Stated differently, given the language of the "freedom to contract" provision, it is unclear whether Manatron's conduct amounted to a breach of the Settlement Agreement: "When . . . the language of a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact-finder." *Trustcorp*, 867 N.E.2d at 212; *see also Mechanics Laundry & Supply Inc. of Ind. Shareholders Liquidating Trust v. American Cas. Co. of Reading, PA*, 2007 WL 1021452, at *2 (S.D. Ind. March 30, 2007) ("Where a contract is ambiguous as applied to the circumstances shown by the evidence . . . summary judgment may be difficult to support."); *Simon Property Group L.P. v. Michigan Sporting Goods Distributors, Inc.*, 837 N.E.2d 1058, 1071 (Ind. Ct. App. 2005) (latent ambiguity arises "upon attempting to implement the contract" and must be resolved by the finder of fact). Accordingly, summary judgment on Nikish's breach of contract claim is denied.

## IV. CONCLUSION

For the reasons set forth above, Manatron's Motion for Summary Judgment (Dkt. 150) is **GRANTED** with respect to Nikish and Bharwani's tortious interference with contract claim, tortious interference with a business relationship claim, and defamation claim. The Motion is **DENIED** with respect to the breach of contract claim.

SO ORDERED: 07/08/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

15

Copies to:

**G. Christopher Bernard**
BODMAN LLP
cbernard@bodmanllp.com,mruvo@bodmanllp.com

**James Dimos**
FROST BROWN TODD LLC
jdimos@fbtlaw.com,award@fbtlaw.com

**Richelle Marie Harris**
FROST BROWN TODD LLC
rharris@fbtlaw.com,jtheal@fbtlaw.com

**Susan M. Kornfield**
BODMAN LLP
skornfield@bodmanllp.com,mpoupard@bodmanllp.com

**J. Lee McNeely**
MCNEELY STEPHENSON THOPY & HARROLD
jlmcneely@msth.com,emtindall@msth.com

**Brady J. Rife**
MCNEELY STEPHENSON THOPY & HARROLD
bjrife@msth.com,lsmanship@msth.com

**Joel E. Tragesser**
FROST BROWN TODD LLC
jtragesser@fbtlaw.com,saddington@fbtlaw.com